## GOOLD *et al. v.* CHAPIN *et al.*

A carrier in possession of goods, to be delivered to a subsequent carrier for transportation, remains liable as insurer, although the second carrier, after notice and request to do so, has neglected for an unreasonable time to receive them.

In order to exonerate himself the carrier must store the goods in a warehouse where there is opportunity to do so, or in some other way clearly indicate his renunciation of the relation of carrier.

So *held*, where a carrier on the Hudson river having goods at Albany to be delivered to a carrier on the Erie. canal for transportation to the owner, removed the goods to a floating barge used by him as a place of temporary storage and to facilitate transhipment to canal boats. The canal carrier unreasonably delayed to receive them after being requested and promising so to do, and they were consumed by fire.

APPEAL from the Supreme Court. Action to recover of the defendants the value of merchandise lost while in their charge as common carriers. The trial was before a referee, who found these facts: The defendants were common carriers on the Hudson river, between New York and Albany, and received the plaintiffs' goods at New York to be transported to Albany

directed to the plaintiffs, at Brockport, to the care of H. Field & Co., Brockport, N. Y., per "Atlantic Line," a line of canal boats running on the Erie canal, and transporting merchandise from Albany to Brockport and Buffalo. The barge Plymouth, with the goods, arrived at Albany on the morning of the 14th August, 1848, and the next day the merchandise was discharged by the defendants from the barge to a float belonging to them lying in the Albany basin. The float was a vessel lying upon the waters in the basin, and was used by the defendants as a place for storing and delivering goods to the canal boats which were to carry them west. The boats came alongside of the float and received the goods. The float was prepared for the purpose of delivering the goods to the canal boats, with the necessary apparatus and convenience for lowering merchandise into the boats. The defendants made a practice of delivering goods from the barge to the float as soon as they could be discharged after arrival. By delivering goods into the float is meant discharging them from the barge to the float the same as if they were put into the defendants' warehouse on land. The float was used exclusively for goods brought up the river in the defendants' barges or vessels. The defendants had at the time two warehouses at Albany, one on the dock and another on the pier. On Tuesday the 15th August, after the goods had been removed from the barge to the float, an agent of the defendants gave notice to the agent of the Atlantic Line, at his office, on the dock at Albany, that there were goods on board the defendants' float for his line, and requested him to come and take them away; which notice and request was repeated on Wednesday and Thursday mornings. When notice was given on Thursday to the agent of the Atlantic Line, he replied that he was then taking some goods from the Eckford Line of tow boats on the river, and that as soon as he got them on, he would have them shove up to the float and take on what goods they had for his line. In the afternoon of Thursday, August 17th, the float and the goods were consumed by fire. The fire commenced on land, at some distance from the basin, and after consuming a large number of buildings, communi

cated to the canal boats in the basin and from thence to the float. The fire did not originate from any want of care or skill on the part of the defendants, but from the want of care of some person, or from accident, and not by lightning. It was known to many merchants and forwarders, and the owners and agents of the Atlantic Line, that the defendants' line discharged their up freight into their float, and from thence into canal boats; but the plaintiffs had no notice or knowledge that they did so. The Atlantic Line had no interest in the defendants' float. The goods were checked and an account taken of them as they were delivered from the float to the canal boats, and the account rendered at the defendants' office. The defendants discharged their goods from the barge into the float, and then their hands in the float delivered them to the hands in the canal boats.

The referee further found that the Atlantic Line did not receive the goods within a reasonable time after notice from the defendants of the arrival of the goods, and after the defendants had requested the agent of that line to take them away. He stated as conclusions of law, that the loss of the goods in question was not occasioned either by the act of God or the public enemy. When they were consumed by fire they were in the possession of the defendants. The float of the defendants in the Albany Basin, to which the goods were transferred by the defendants from their barge, was not a warehouse, but a floating vessel. The relation of the defendants to the goods after their removal to the float was the same as it would have been had the goods remained in the barge Plymouth until they were consumed by the fire of the 17th of August, 1848. The practice or custom of the defendants to transfer their up freight to their float on its arrival at Albany, did not constitute a valid usage, binding on the plaintiffs, to the effect that the liability of the defendants, as carriers, ceased on the removal of the goods to the float. The plaintiffs have no remedy against the Atlantic Line for the loss of the goods, that line not having received the goods previous to the time of such loss. He further stated as a conclusion of law—contrary to his own judg-

ment but for the purpose of conforming to a previous decision of the Supreme Court in the case—that the liability of the defendants, as common carriers, did not continue beyond the period of the arrival of the goods at Albany, and notice to the agents of the Atlantic Line of the readiness of the defendants to deliver to them the goods; or at least did not continue beyond the expiration of a reasonable time from the receiving of the goods by the Atlantic Line, after notice from the defendants of their readiness to deliver them; and that after the liability of the defendants as carriers so ceased, they became liable only to the plaintiffs as bailees on deposit or as quasi warehousemen; and that as the goods were not destroyed by means of any negligence or fault on their part, they were not liable to the plaintiffs for the loss of the goods.

The judgment for the defendants entered upon the report of the referee having been affirmed at general term in the third district, the plaintiffs appealed to this court.

*Henry R. Selden*, for the appellants.

*John H. Reynolds*, for the respondents.

JOHNSON, Ch. J. Although we cannot fail to see that the destruction of the goods in question was inevitable and that no blame can be attributed to the defendants for their loss, yet the question whether that loss shall be borne by them or by the plaintiffs must be decided according to the principles which are applicable to the legal relation which the defendants sustained to the goods at the time the fire occurred. The cause and circumstances of the destruction were such as a common carrier is bound to answer for, but not such as suffice to charge a bailee for custody merely. The important inquiry therefore is, whether the goods at their destruction were in the custody of the defendants as carriers.

The goods were delivered to the defendants in New York to be carried to Albany, and there delivered to another carrier to be transported to Brockport, N. Y. All this appears from the

receipt given on the shipment of the goods, which discloses plainly these facts and shows that the parties to whom delivery was to be made at Albany were to receive the goods not as owners nor as general consignees of the owners, but as carriers. In *Van Santvoord* v. *St. John* (6 *Hill*, 157), it was held that the first carrier's obligation was discharged when he had safely deli·vered the goods to the next carrier, but that case did not present any question as to what would amount to such a delivery. The same remark is applicable to *Ackley* v. *Kellogg* (8 *Cow.*, 223). In both cases the second carrier had actually received the goods and was chargeable as carrier for their safety. It is found by the referee in this case—and as we have not the evidence we must certainly assume the finding to be well warranted—that the Atlantic Line did not receive the goods from the defend·ants within a reasonable time after notice was given of their arrival and a request that they should be taken away. Assuming that such notice, if given to the owner at the end of the transit, and the unreasonable delay in taking the goods, would have put an end to the liability of the defendants as carriers, yet, as I think, the cases and the nature of the transaction itself point to a distinction between that case and the case of con·signee or second carrier. If an undue refusal to receive by the the owner at the end of the transit would justify the carrier in renouncing all further care over the goods, it clearly would not in the case of consignee or subsequent carrier, where these relations were known to the first carrier. In *Ostrander* v. *Brown* (15 *Johns.*, 43), Mr. Justice PLATT, giving the opinion of the court, says: "Suppose the consignees had been dead or absent or had refused to receive·the goods in store, what would have been the carrier's duty? Certainly he would have no right to leave them on the wharf or in the street without pro·tection. He would not be justified in abandoning the goods. He had notice that S. and B. were the owners, and if M. and O. would not take charge of the goods as consignees, he ought to have secured them on board his vessel or in some other place of safety." This was said in a case where the goods were left unprotected on a wharf, and the duty of protection was the

only point to be made out. In *Fisk* v. *Newton* (1 *Denio*, 45), the goods had been stored; the consignee not being found after due search, and the storekeeper having failed and the goods being missing, the question was whether such storing was a defence to the carrier, and it was held that he was not liable. Now the goods in this case were transferred from the boat to the float to enable the defendants to complete their contract by making delivery. The float was not a storehouse in the proper sense of that word. It was a part of the machinery to facilitate the business of carriage, which the defendants adopted for their own convenience in performing their contracts to carry and deliver. When the goods were unladen from the boat on which they were brought up the river and placed upon the float, it was a step in performance of the contract to deliver, but not a delivery. The performance was not by that act complete. It was a mode of delivery which undoubtedly promoted the convenience of both sets of carriers, but it did not alter the responsibility of the first carrier who had not yet made delivery. There was no refusal to receive on the part of the second carrier, but there was unreasonable delay. The defendants, however, did not find this delay so unreasonable as to feel compelled to make any new disposition of the goods. They did not remove them from the exposure of a floating vessel, from different parts of which goods were being delivered to different lines, and place them in store. They indulged the other carriers in the delay, as from the course of business was natural and suitable; and until some act was done on their part indicating a clear purpose to make an end of their relation of carriers as to these goods, I think their responsibility as such continued. No owner can be supposed to have an agent to superintend each transhipment of his goods, in the course of a long line of transportation; and if the responsibility of each carrier is not continued until delivery in fact to the next carrier—or at least until the first carrier, by some act clearly indicating his purpose, terminates his relation as carrier—we shall greatly diminish the security and convenience of those whose property is necessarily abandoned to others, with no

safeguards save those which the rules ·of law afford. The stringency of the rules belonging to this species of bailment had its origin in public policy, which long experience has approved as wise and salutary. Any other rule in respect to the duty of carriers at such points of transhipment, when unmodified by custom, than that above contained, would give rise and afford protection to the same class of mischiefs against which public policy has protected the community by the strict responsibility imposed upon carriers in other cases.

S. B. STRONG, J. The defendants did not change their responsibility as common carriers, and adopt that of warehouse-men, by removing the goods from their barge to their float, on their arrival at Albany. The change was their own act without consultation with or notice to the plaintiffs or their agent; the goods were still subject to their control, and there had been no actual delivery. The float was in effect a substituted means of conveyance furnished by the defendants. By placing the goods on that, the transit from the plaintiffs to their agent was not terminated. It was so decided by this court in the case of *Miller* v. *The Steam Navigation Company* (6 *Seld.*, 431). In that case, as in this, there had been a removal of the goods from a barge to a float, and Judge JEWETT said, "there was nothing to show an intention to store the goods, or anything to justify the defendant to do that, if such had been the intention. The facts and circumstances show conclusively that the defendant, instead of being engaged in storing the goods, was placing them in a situation to deliver· them according to its contract. The goods had not been placed entirely in a condition to deliver them when the accident happened. The defendant was at no time discharged of the responsibility which it had assumed as a common carrier."

There is undoubtedly an important difference between that case and the one which I am now considering. In that there had been no delay by the agent of the intended receiving line in furnishing the requisite means for the delivery of the goods; in this case there were repeated delays. Notices that the

goods were ready for delivery and calling for their reception, had been given to the agent of the Atlantic Line on three successive days. No canal boat was sent to the float to receive the goods on either day, but on the third day the agent on being served with the notice "replied that he was then taking some goods from the Eckford Line of tow boats on the river, and that as soon as he got them on he would have them shove up to the float and take on what goods they had for his line." The goods were retained on the float until they were consumed by a fire on the afternoon of the same day. The referee finds that the Atlantic Line did not receive (he doubtless meant furnish the means to receive) the goods within a reasonable time after notice from the defendants of the arrival of the goods and after the defendants had requested the agent of that line to take them away. The question is whether by reason of this delay the defendants were relieved from their responsibility as common carriers at the time of the fire. Of course there had been no delivery. The goods were still in possession of the defendants, and subject to their control. If they had the power to change the character of their possession, when was it changed? Not surely at the moment of serving the notice. A reasonable time for taking possession of the goods by the Atlantic Line must undoubtedly have first elapsed. If there had been no delay there could have been no hiatus between the responsibilities of the two. When the responsibility of the defendants had terminated, that of the Atlantic Line would have commenced. When goods are forwarded by connecting lines, the owners have a right to consider them under the safeguard of a constant responsibility until they reach their place of destination. If a more lax rule should be established it would greatly prejudice the interests of the freightors on these extensive lines. To be sure, where there is no partnership between the proprietors of the several lines they should not be held responsible for the conduct of each other, nor can they be. In this case the delay of the Atlantic Line in receiving the goods did not impose upon the defendants the necessity of retaining possession of them beyond a reasonable time for their

Goold *v.* Chapin.

reception after service of the notice. They might have un-questionably deposited the goods in a warehouse, and thus have relieved themselves from further responsibility; or they might, as they did, elect to retain them in their own possession. As they chose to retain them it must have been in their original character as common carriers. If they had intended to make a change, common fairness required that they should have given notice to the Atlantic Line to that effect. Even that would have been insufficient, as the agent of that line had no autho-rity to relieve the defendants except by receiving the goods in behalf of his principals. No great wrong can be done to common carriers in ordinary cases by holding them to their responsibili-ties as such until they part with the possession and control of the goods, either by delivering them to the consignees or deposit-ing them in a warehouse where, as in this case, one is accessible. It may subject them to some inconvenience, but it is better to do that than to expose the owners of goods, who are not usually present so as to protect their own interests, to losses by reason of the misconduct or omissions of the managers of the different lines at their places of connection. In this case the defendants retained the goods on their float probably from an expectation that they would soon be taken by the Atlantic Line, and possi-bly to save themselves the trouble of depositing them in a ware-house. In doing so they consulted no one, but acted at their own option, and as I conceive at their own risk.

It is not intended to decide that common carriers can in no case change their peculiar responsibilities while they retain possession of the goods confided to them. They may not be able with due diligence to find any one to receive the goods in behalf of the owner, and there may not be any safe place of deposit within their reach, and in such case their duties as carriers would end, and they would then become mere ordinary bailees. They may also deposit the goods in their own ware-house, and thus absolve themselves from any further responsi-bility as common carriers. That, however, can only be where there has been a failure by the owner or his agent to receive them.

There may be exceptions to the general rule as to the delivery of goods where they are conveyed by a railroad company directed to some station short of the termination of the route, or where they are transported by a steamer to be left at some wharf intermediate the termini of the voyage, and where by their known course of business the carriers can neither give notice to nor seek out the owners or consignees, and where no time can be spared to deposit the freighted goods in a warehouse. In such cases a delivery at the usual place at the station or on the dock, with notice if the person to receive them is present, or without notice if no one is present to receive any for or on behalf of the owner or consignee, would probably be sufficient. In the present case, however, there is nothing calling for an exception.

The judgment of the court below should be reversed, and there should be a new trial.

COMSTOCK, J., dissented; SELDEN, J., expressed no opinion

Judgment reversed, and new trial ordered.