Elizabeth McDonald, Administratrix of James McDonald, deceased, v. The Western Railroad Corporation.

Where goods are shipped and must pass through the hands of several intermediate carriers before arriving at the place of their destination, the duty of each intermediate carrier is to transport the goods safely to the end of his route, and deliver them to the next carrier on the route beyond.

An intermediate carrier, in such case, does not relieve himself from liability by simply unloading the goods at the end of his route, and storing them in his warehouse, without delivery or notice to, or any attempt to deliver to, the next carrier.

Appeal from the Supreme Court. Action to recover of the defendants the value of a quantity of marble, alleged to have been lost while in their charge as common carriers. The trial was before Mr. Justice Miller, without a jury, who found, in substance, these facts :

On the 20th June, 1861, one Henry E. Comes (the assignee of the plaintiff's intestate), being the owner of two boxes of marble (a monument), shipped the same at a station on the Harlem Railroad, directed to "Elijah W. Brigham, Binghamton, New York, Harlem Railroad to Albany, Erie and Chenango canal to Binghamton." The boxes of marble came to Chatham, Columbia county, by the Harlem Railroad, and were delivered to the defendants (the latter paying charges thereon to the Harlem Railroad Company), on the 21st June, 1861 ; and on the 22d June the defendants carried the goods from Chatham to East Albany, the western terminus of their road, and deposited the same in their freight house, awaiting transportation by canal. On the 5th July, 1861 (thirteen days after their deposit in the freight house), the freight house took fire, and the goods were destroyed, without fault of defendants.

The judge further found, as facts, that when goods came into the possession of the defendants, as these goods did, it was their custom to send and tranship them as directed ; that the goods could be soonest forwarded by boat on the Erie canal to Utica, and then transferred to boats on the Che-

nango canal, but that it was the defendants' custom to wait for a through line from East Albany to Binghamton; that their general custom was, when freight was destined for transportation on any of the canals collateral to the Erie, to ship it by a direct line through the collateral canal. They made delivery at their depot (when no particular line was mentioned) to any responsible through line that would take the goods. There was an uncertainty as to the time of sending boats through by the direct line on the Chenango canal; they would leave Albany sometimes once a week, sometimes once in two weeks, and sometimes not more than once in three weeks. That the defendants had no knowledge of any boat that would take these goods during the period from their arrival at their depot until their destruction by fire; and that, in fact, the direct line through the Chenango canal did not have a boat at Albany when the goods were at the depot. That it was the practice of the canal lines to have carmen looking out for freight for respective lines and places, and the carmen accustomed to look out for, and take freight from, the defendants' depot for the direct line through the Chenango canal was there each day during the period the goods were there, and it was his custom, if the line had a boat at Albany, to take goods for the Chenango canal to such boat, and if they had no boat at Albany, then to allow the goods to remain stored with the defendants until such time as the line had a boat at Albany. This carman did not know the marble was there at the time it was burned, nor was he notified by the defendants to take it.

The judge held and decided that the defendants were common carriers of said goods; and that the said goods were in the possession of the defendants as such common carriers at the time of said fire. To which conclusion of law the defendants excepted.

The judge further held and decided that the defendants were liable for the value of said goods, being $119.67; which sum the plaintiff was entitled to recover of the defendants. To which the defendants excepted.

The defendants appealed from the judgment at the Circuit to the General Term, where the same was affirmed; and they now appeal to this court.

*R. W. Peckham, Jr.*, for the plaintiff.

*J. H. Reynolds*, for the defendants.

Wright, J. The single question is, whether the goods, when destroyed, were in the custody of the defendants as carriers or warehousemen? If as carriers, they are liable for the loss; if as warehousemen, they are not bound to answer for it, as the destruction of the goods was without fault on their part.

The leading facts upon which the question arises are these: On the 20th of June, 1861, one Comes, being the owner of two boxes of stone or marble monument, shipped the same at a station on the Harlem Railroad, directed to "Elijah W. Brigham, Binghamton, N. Y., Harlem Railroad to Albany, Erie and Chenango canal to Binghamton." The boxes were received by the defendants from the Harlem Railroad Company on the 21st of June, at Chatham, a freight station on their road, they paying freight charges thereon to the Harlem Company; and on the 22d of June, the defendants carried them to East Albany (the western terminus of their railroad), unloaded them from their cars, and stored them in their freight house, to await transportation by canal. On the 5th of July (the goods being still stored) the freight house took fire, without fault of the defendants, and the building and its contents were wholly destroyed. There were different transportation lines from East Albany to Binghamton by the Erie and Chenango canal, having agents at Albany and at the defendants' depot, but up to the occurrence of the fire no notice had been given by the defendants of the arrival of the goods, or any attempt made to deliver them to any succeeding carrier.

The goods were then in the possession of the defendants when lost, but what relation did they sustain to them? It is not questioned but it was that of a common carrier, from

their reception at Chatham to the end of their road. How did they divest themselves of that liability? They had made no delivery to any one; and their duty as carriers was not discharged until they had delivered the goods to the party entitled to receive them; which, in this case, was the next or succeeding carrier in the line of transit to their place of destination. The goods had been received by the defendants at Chatham to be transported to Binghamton by way of the Erie and Chenango canal. Their obligation, therefore, was to carry the goods safely to the end of their road, and deliver them to the next carrier on the route beyond. A carrier, in such case, does not release himself from liability by simply unloading the goods at the end of his route, and placing them in his own storehouse, without delivery or notice to, or any attempt to deliver to, the next carrier.

It is said that in this case, the goods being delivered to the defendants marked to an address in Binghamton, by the Erie and Chenango canal, no particular line of carriers beyond Albany being named, the responsibility of the defendants, as carriers, ceased the moment the goods were unloaded from the cars; and from that time they became forwarders according to the established usage of the business. But the answer to the suggestion is, that no such general usage was shown, and if it had been, it could not have affected a consignor without knowledge of it.

As there had then been no delivery to succeeding carriers, no notice of the arrival of the goods, or any attempt to deliver, I am of the opinion that they were in the defendants' custody as carriers, and not as bailees for custody merely, at the time of their destruction, and that the defendants were properly held responsible for the loss.

The judgment should be affirmed.

Smith, J. When the defendants undertook to transport the marble in question over their road, they assumed, in respect to it, the liability of common carriers. Such liability continued and was in force at the time of the destruction of the marble, unless it was ended by some positive rule of law,

or some act or circumstance which occurred at or after the termination of the transit over their road, and (it may be added) without the agency or knowledge of the next carrier, or of the owner or consignee of the goods.

*Prima facie*, the strict liability of the carrier does not end with the mere transit, but continues until safe delivery of the goods to the owner or consignee at the place of destination. There are cases, however, in which the obligation of carriers to deliver personally, must, in the nature of things, be many times dispensed with. Thus, carriers by ships and boats must stop at the wharf, and railroad cars must remain on the track. In those cases, according to the weight of authority in this State, *notice* to the owner or consignee of the arrival of the goods, and a reasonable time and opportunity after notice to remove them, would come in lieu of personal delivery, so far as to change the strict liability of the carrier to that of a warehouseman. (15 Johns., 39; 17 Wend., 305; 1 Denio, 45; 3 Comst., 322.)

The present case, however, does not relate to the liability of the carrier at the end of the route. The defendants were intermediate carriers. Their line of transportation was one of several, which together formed a continuous route, over which goods were transported for hire. We may judicially take notice of the fact that the vast business of inland transportation of goods in this country is carried on mainly upon similar routes, formed by successive connecting lines of transit belonging to different owners, each of whom carries the goods over his own line and delivers them to the next, who in his turn takes them on till they reach the place of final destination.

Now, it is apparent that, to carriers thus situated, and to goods thus transported, the policy of the common law rule of liability applies with peculiar force. It is a public policy, springing from the public nature of the employment of carriers, and rendering their good conduct a matter of importance to the whole community. Many of the routes of transportation in this country, formed in the manner above stated, extend over thousands of miles. Their proprietors invite and

receive goods for transportation upon the promise, express or implied, that they shall be carried safely to the place of delivery. The owner loses sight of his goods when he delivers them to the first carrier, and has no means of learning their whereabouts, till he or the consignee is informed of their arrival at the place of destination. At each successive point of transfer from one carrier to another, they are liable to be placed in warehouses, there, perhaps, to be delayed by the accumulation of freight or other causes, and exposed to loss by fire or theft, without fault on the part of the carrier or his agents. Superadded to these risks are the dangers of loss by collusion, quite as imminent while the goods are thus stored at some point unknown to the owner, as while they are in actual transit. As a general rule, the storing under such circumstances should be held to be a mere accessory to the transportation, and the goods should be under the protection of the rule which makes the carrier liable as an insurer, from the time the owner transfers their possession to the first carrier till they are delivered to him at the end of the route. In the language of Abbott, Ch. J., in *Batson* v. *Donovan* (4 B. & Ald., 43), " it is the duty of courts, so far as shall be consistent with justice and law in each particular case, to follow up the good old principle of the common law, and do everything that may induce greater care and caution."

There may be circumstances, however, as was said in *Goold* v. *Chapin* (20 N. Y., 259), under which the intermediate carrier should be held liable as a warehouseman only. As, when he gives *notice* to the next carrier to take the goods, and, on the *neglect* of the latter to do so in a reasonable time, he deposits them in his warehouse, or otherwise indicates his renunciation of the relation of carrier. (Id.)

But no such circumstances exist in the present case. The removal of the marble by the defendants from the cars to their freight house, on its arrival, was done, plainly enough, for their own convenience of delivery to the next carrier, in performance of their contract. For aught that appears, their continuing to hold it in store was an act of the like character. It was in accordance with their custom thus to store

freight for the canal line, from one to three weeks, till a boat was at Albany ready to receive it. They gave no notice to the through line to take the marble. They were not excused from giving such notice by the fact that the line had no agent at Albany. It is not to be presumed that there was no proprietor or agent of the line whom they could reach with notice, connected as they were with the line in a continuous route of transportation.

There is, therefore, no rule of law, and no fact or circumstances in this case, relieving the defendants from responsibility as carriers.

The cases of *Thomas* v. *Boston and Providence Railroad Company* (10 Metc., 472), and *Norway Plains Company* v. *Boston and Maine Railroad Company* (1 Gray, 263), were those of goods deposited by the carriers in their depot, at the place of destination. In the first, notice was given to an employé of the owner and agent, and a part taken away by him; and in the latter, notice was given to the owner's authorized agent (p. 275). But in some respects the doctrines stated in those cases are in conflict with the views above expressed, and to that extent they have not been concurred in by this court.

The principles enunciated in *Goold* v. *Chapin* (*supra*), *Blossom* v. *Griffith* (3 Kern., 569), *Miller* v. *Steam Navigation Company* (6 Seld., 431), and *Ladue* v. *Griffith* (25 N. Y., 364), if not decisive of this case, give much support to the grounds on which, I think, it should be placed.

I am of opinion the judgment should be affirmed.

Hunt, J. On the 20th day of June, 1861, the plaintiff's assignor shipped two boxes of marble monument, from a station on the Harlem railroad, directed to " Elijah W. Brigham, Binghamton, New York, Harlem railroad to Albany, Erie and Chenango canal to Binghamton." The plaintiff did not accompany the stone, and gave no other directions than those mentioned upon the boxes. The goods were received by the defendants from the Harlem railroad, transported to East Albany, which is the terminus of the defend-

ants' road, and deposited in their warehouse. This was on the 22d of June, 1861, and on the 5th of July, 1861, the defendants' warehouse, with a large amount of property contained in it, the property in question among the rest, was destroyed by fire. The plaintiff sues the defendants for the value of the marble thus destroyed, claiming that the liability of a common carrier remained upon them at the time of the loss. The defendants, on the other hand, contend that the carrier's liability had ceased, and they were under no greater liability than that of a warehouseman, which is that of care and diligence merely.

In receiving the goods in question from the Harlem road, in transporting them upon their road to East Albany, and into their warehouse in that place, all agree that the defendants acted as common carriers, and were subject to the responsibilities of bailees of that character. When or by what act was their character as such ended, and that of warehousemen or forwarders substituted? Was it when the property was removed from the cars and placed in safe deposit in their warehouse? The cases of *Thomas* v. *Boston Railroad Co.* (10 Metc., 472), and *Norway Plains Co.* v. *Boston and Maine Railroad Co.* (1 Gray, 263), afford apparent countenance to this idea. In both of these cases, however, this important fact existed, that the place of delivery was at the termination of the carrier's road. The goods were to be delivered in Boston, and Boston was the termination of the carrying road. What would have been the duty of the carrier if the goods had required further transportation, was therefore not in question, and not alluded to by the court in either of those cases.

That the removal from the cars and deposit in their own warehouse did not, of itself, change the character of the defendants' liability, is established by the cases of *Goold* v. *Chapin* (20 N. Y., 259), and *Van Santvoord* v. *St. John* (6 Hill, 167.)

Those cases hold that the carrier must perform some act, distinctly indicating his intention, to end his liability as carrier, and calculated to accomplish that result, before he can

cease to be a carrier, and become a forwarder or warehouse-man. In the last case referred to, the defendants received the box of goods addressed to "J. Petrie, Little Falls, Herkimer Co.," with no other direction, transported it by their barges to Albany, and thence shipped it by a responsible line of canal boats on the Erie canal, to be delivered to the consignee at Little Falls. Before reaching that place, the box was rifled of its contents. The court held that it was not the duty of the defendants themselves to transport the property to Little Falls; that a compliance with their custom to deliver the same on board of a boat going to that place, was a performance of their duty as carriers.

In the case of *Goold* v. *Chapin*, the goods were also received at New York by the defendants, a barge company, and to be transported to a place on the Erie canal, west of Albany. The direction was to the plaintiffs, "to the care of Field & Co., Brockport, N. Y., per Atlantic line." The goods arrived at Albany on the morning of the 14th of August, 1848, and during the day following were discharged into a float belonging to the defendants, and which was used as a place for storing and delivering goods to the canal boats going west. The defendants had at the time two warehouses at Albany, one on the dock, another on the pier. On Tuesday the 15th, the defendants gave notice to the agent of the Atlantic line, that the goods were on board the float for his line, requesting him to take them away. This notice was repeated on Wednesday morning and on Thursday morning. On the afternoon of Thursday, the goods were consumed while on board the float, by a fire which commenced on shore and spread among the shipping. This court held that the defendants were liable as carriers; that the notice to the Atlantic line, and their unreasonable neglect to take the goods, did not exempt them; that, to exempt themselves, the carriers must store the goods in a warehouse, or in some other way clearly indicate a renunciation of the relation of carrier. The court held that, as there was neither a deposit in a warehouse, which would have indicated clearly a renunciation of the carrier's liability, or a delivery to the carrier by canal,

which would have fulfilled the duty of the first carrier, the defendants were liable.

The defendants in the present case did no act indicating that they had renounced the liability of a carrier. They simply unloaded and deposited the goods in their warehouse. Had this deposit been made in the warehouse of a company engaged in canal transportation westwardly, it would have been an act of great significance. But here the fact is expressly found that it was the custom of the further carrier to take the goods from the defendants' depot. The liability of the further carrier did not commence until he removed the goods from the defendants' warehouse. The deposit, therefore, by the defendants, in their own warehouse, did not afford any evidence of a renunciation of the carrier's liability. The case of *Ladue* v. *Griffiths* (25 N. Y., 364) is somewhat similar. There the defendant was a warehouseman of Buffalo, and a carrier on the Erie canal, and used to receive freight from the west and forward it to the east by the first boat going, whether his own or that of other carriers. He received goods from Detroit, addressed to his care at Buffalo, and marked to go from " Buffalo to East Albany, at 30 cts. per 100 lbs." The presumption, the court say, from these facts alone, is, that the goods came to his possession as carrier, and, having been burned while in his warehouse awaiting transportation, he is liable for their value. The goods might have gone by some other line, in which case, Griffiths would never have been a carrier at all. But they might, at his pleasure, have been placed upon his own boats, and hence he was held as a carrier. In the present case, the goods came to, and remained in, the defendants' warehouse by their own act, awaiting transportation, and as a part of the contract of carriage. The goods were placed in the defendants' warehouse for their own convenience, for the purpose of, and until they should be delivered to the further carrier, for transportation by canal. (Ang. on Carriers, §§ 131, 140 ; Story on Railroads, 536 ; cited in *Ladue* v. *Griffiths, supra.*)

I think the deposit in the defendants' warehouse was a mere accessory to the defendants' carriage, in which case the

carrier's liability still remains. (*Blossom* v. *Griffin*, 3 Kern., 569, 572.) East Albany is upon the left bank of the Hudson river, a stream flowing down from many miles above Albany, and continues one hundred and fifty miles farther down. It was a boundary, impassable to the railroad, as no bridge then existed, and when reached, goods, whether they were to be at once shipped to the west, or whether that was their final destination, must necessarily have been unloaded in the warehouse, and left there until a barge or a canal boat should come to receive them, or they should be demanded by the owners. The defendants' liability as carrier was unbroken.

No claim is made by the defendants upon the argument that their liability is discharged by notice to the further carrier that the goods were ready for his transportation. There was no sufficient notice in the present case, and in *Goold* v. *Chapin* (*supra*), the notice repeatedly given and unreasonably neglected by the further carrier was held to constitute no defense.

I am for affirmance of the judgment.

Judgment affirmed.