Wood vs. The Milwaukee and St. Paul Railway Company.

27  541
92  395

## Wood vs. The Milwaukee and St. Paul Railway Company.

COMMON CARRIER: (1–3.) *Common carrier for part of the route; when his liability as such ceases, for goods ready to be delivered to the next carrier.* (1.) *Second carrier agent of owner or consignee to receive the goods.* (2.) *" Reasonable " time therefor.* (3.) *When first carrier liable only as warehouseman.* (4, 5.) *Office of the court and jury in determining such liability.* (6, 7.) *What " notice " that goods are ready required to be given second carrier.*

1. Where a common carrier (in accordance with his contract) conveys goods over only a portion of the route between the points of shipment and consignment, and holds them for delivery to some connecting carrier, the latter is the owner's or consignee's agent to receive the delivery (*Schneider v. Evans*, 25 Wis. 241); and the liability of the former as a common carrier continues until the goods are ready for delivery to such agent, and he has had a reasonable time to take them away. *Wood v. Crocker*, 18 Wis. 345.

2. Such "reasonable time" is the earliest practicable time after the first carrier is ready to deliver, and is not measured by any peculiar circumstances in the condition of the second carrier, requiring for its convenience that it should have a longer time.

3. If the goods are not removed within such reasonable time, and are subsequently destroyed while in the first carrier's possession, it is liable only as warehouseman.

4. Subject to the above defined legal principles, it is for the jury to say, in an action for goods so destroyed, whether a reasonable time for the removal had elapsed before their destruction.

5. Where the uncontradicted evidence for the plaintiff fails to show that the goods were not ready for delivery long enough before the accident to afford a reasonable opportunity for their removal, it is error to take from the jury the question whether the defendant carrier's liability was not simply that of a warehouseman.

6. It is not necessary in such a case to show a written or oral notice that the goods were ready for delivery; but notice may be implied from the course of dealing between the parties, or the custom and usage of the business.

7. The defendant company was accustomed to deposit goods arriving at its depot in La Crosse, and intended for Winona, Minn. (the place of consignment in this case), in a certain portion of its warehouse at La Crosse, set apart for that purpose, and after bills of lading, etc., were made out by defendant's employees for its use and that of the next carrier, the goods were ready for the latter, which thereupon took them from the warehouse and deposited them upon its boat. It was not defendant's custom to give any other notice of the arrival of goods to the second carrier; but for the boats of the latter to call regularly twice a day and take the goods which were ready for delivery.

LYON, J., is of the opinion:

(1.) That the shipper is presumed to have known the usages and general course of business prevailing between the successive carriers, as to notice of the arrival of goods and delivery for further carriage, and is bound by them.

(2.) That defendant was not bound to do any act further than in conformity with its said usage, in the way of notice or tender of the goods to the next carrier.

APPEAL from the Circuit Court for *Dane* County. The defendant appealed from a judgment in favor of the plaintiff. The questions presented by the record will sufficiently appear from the opinion.

*John W. Carey* for appellant:

In England, when a carrier receives goods destined to a point beyond the end of its line, the implied contract is that the carrier will safely transport the goods to their destination, without regard to the number of changes that may be required to reach that point. In this country the common law, as settled by the decisions of all the courts that have passed upon the subject, is this: that the carrier, in such a case, is bound to safely carry the goods over its own line, and at its terminus forward them by the next succeeding carrier in the usual way. The forwarding may be done by actually placing the goods on the carriage of the next carrier, or otherwise delivering them into his custody; by notifying him that they are ready to deliver, or stored subject to his order; or by depositing them in a suitable place, *according to the uniform and well-known custom and usage of doing business at that place, from which place such next carrier is in the uniform, regular, daily habit af calling for and taking the goods so deposited without other notice.* Van Santvoord v. St. John, 6 Hill, 157; Hood v. New Haven R. R., 22 Conn. 1; Nutting v. R. R., 1 Gray, 502. If the carrier is *merely* a carrier, his liability ends when he has deposited the goods with a warehouseman and forwarder at the end of his route; but if he is also a warehouseman and forwarder, he remains liable as such, but not as a carrier. On account of the difference already

JANUARY TERM, 1871. 543

Wood vs. The Milwaukee and St. Paul Railway Company.

pointed out between the American and English law, as to the implied contract of the carrier who receives goods destined for a point beyond his route, it is only where goods in England are sent under a special contract to transport over the carrier's line *and then forward*, that the English cases are directly applicable to those arising under our law. Such a contract, under the English rule, is the exact equivalent of the implied contract of the carrier in this country. The following cases show that the carrier's liability *as such*, under a contract of the kind above described, terminates when the goods arrive at the terminus of his own route, and are properly deposited in the carrier's warehouse. *Garside v. Trent, Nav. Co.*, 4 Term, 581, 582 ; *Hyde v. Trent Nav. Co.*, 5 id. 387 ; *Rowe v. Pickford*, 8 Taunt. 83 (4 E. C. L. 27) ; *Richards v. R. R.*, 7 Man. Gr. & Scott, 839 ; *Allan v. Gripper*, 2 Cromp. & J. 218. There is no law in England requiring the carrier's liability to be continued for a reasonable time to enable the owner to take away his goods. *Gatliffe v. Bourne*, 4 Bing. N. C. 314 ; *S. C.*, 42 E. C. L. 337 ; *S. C.* in House of Lords, 49 E. C. L. 850. The law is the same in this country. 2 Story on Contracts, §§ 759, 759 b, 759 c ; 1 Parsons on Con. 619, 620 ; Angell on Carriers, §§ 75, 301–307 ; Edwards on Bailm. 515, 524 ; 16 Vt. 52 ; 18 id. 52 ; *Van Santvoord v. St. John*, 6 Hill, 157 ; *Gibson v. Culver*, 17 Wend. 305 ; *Albatross v. Wayne*, 16 Ohio, 513 ; 4 Harrington, 468 ; 2 Redf. on Carriers, 64 ; *Denny v. N. Y. Central R. R. Co.*, 13 Gray, 481–87 ; 4 Allen, 520–23 ; *Union Co. v. Hart*, 30 Ga. 798 ; *Jenneson v. C. & A. R. R. Co.*, 4 Am. Law Reg. O. S. 234, and cases cited. A railroad company is not bound to deliver goods except at its depot, and no notice of the arrival of goods is required to be given ; and where goods have reached their destination, or the end of the carrier's line, and are unloaded into the warehouse, the liability of carrier ceases and that of warehouseman begins. 2 Redfield, 50–64 ; *Bansemer v. R. R. Co.*, 25 Ind. 434 ; *Richards v.*

*S. R. R.*, 20 Ill. 404; *Porter v. R. R. Co.*, id. 407; *Davis v. R. R. Co.*, id. 412; *Thomas v. Railroad Corp.*, 10 Met. 472; *Norway Plains Co. v. R. R.*, 1 Gray, 263. This court, in *Wood v. Crocker*, 18 Wis. 345, following *Moses v. B. & M. R. R.*, 32 N. H. 523, modified the above rule so far as to hold that " the owner or consignee must have a reasonable opportunity to take them away." Admitting this qualification of the doctrine, it would not affect this case. That reasonable time is only such time as a watchful party would· require *to* remove the goods; and no extension of the time is to be allowed in consequence of the party's not being present at the depot when the goods are unloaded. [Counsel examined and distinguished the cases of *Miller v. Steam Co.*, 10 N. Y. 431; *Gould v. Chapin*, 20 id. 259; *Ladue v. Griffith*, 25 id. 364; and *McDonald v. R. R. Corp.*, 34 id. 497]. 2. If it is shown that the uniform custom of doing business in such cases is to deposit the goods, and that the next carrier uniformly calls for them at regular and stated intervals, as daily or on each trip, without notice or request so to do, and takes them from such place of deposit, then no other notice to such carrier is required. *Gibson v. Culver*, 17 Wend. 305; *F. & M. Bank v. Champlain Transp. Co.*, 23 Vt. 186; *S. C.*, 18 id. 52, and 16 id. 52; *Darling v. B. & W. R. R.*, 11 Allen, 295; *The Ship Grafton*, Olcott, 48. To the point that such deposit is sufficient as a delivery, counsel cited the opinion of GROSSE, J., in *Garside v. Trent, supra;* 13 Gray, 4 Allen, and 17 Wend., *ubi supra;* 2 Redfield, 64; *Converse v. Transp. Co.*, 33 Conn. 166.

*Gregory & Pinney*, for respondent:

Where goods are shipped and must pass through the hands of several intermediate carriers before arriving at the place of their destination, the duty of each intermediate carrier is to transport the goods safely to the end of his route, and deliver them to the next carrier on the route beyond. *McDonald v. Western R. R. Corp.*,

34 N. Y. 497; *Goold v. Chapin*; 20 N. Y. 259; *Lawrence v. R. R. Co.*, in Minn. Sup. Ct. July Term, 1870; *Van Santvoord v. St. John*, 6 Hill, 157; *Hooper v. Ch. & N. W. Railway Co.* [*ante*, p. 81]. Public policy, in this country of long routes and frequent transportation, forbids any intendment which would favor an intermediate carrier in divesting himself of that character and assuming the more limited responsibility of forwarder or warehouseman. In such a case, all those considerations of public policy and necessity upon which the liability of a carrier as such is founded, exist as fully as though the goods were in process of *actual* transit, and continues until the duty of delivering them to the next carrier is performed. *Ladue v. Griffiths*, 25 N. Y. 364; *Miller v. Steam Nav. Co.*, 10 id. 431; *Blossom v. Griffin*, 13 id. 569. The storage, such as it was, was merely accessory to the carriage of the goods and the performance of the duty of defendant as carrier in regard to them. The defendant's liability as carrier continued at the time of the loss, as there had been no delivery or offer to deliver the goods, and no notice given to the next carrier of their arrival. The ordinary method of giving notice and offering to deliver was the production of the tally-lists upon the arrival of the boat, at which time the papers were, according to the course of business, ready, so as to make delivery and retain some trace of the goods and evidence of the delivery, which would enable the owner to trace his property into the hands of the next carrier. The evidence is clear and uncontradicted, that, according to the course of business, and as a matter of fact, the defendant was not ready to part with the goods to the Packet Company until the evening of the 14th, when, to promote the convenience of both carriers, delivery was postponed until the War Eagle should be unloaded; and before the Keokuk could take its place at the dock, the warehouse and contents were destroyed. 2. Counsel also argued

that commercial usage, in order to have it take the place of general law, must be so uniformly acquiesced in by length of time, that the jury will feel themselves constrained to say that it entered into the minds of the parties and made a part of the contract (Angell on Carriers, § 301); and that in this case it was not proved that plaintiff had any notice of defendant's custom as to depositing goods for the Packet Company at La Crosse, as it was not shown to have continued so long as to afford presumptive evidence that he knew it.

Lyon, J. The plaintiff shipped from Boston and New York forty-one packages of merchandise consigned to himself at Winona, Minn. At Watertown, in this state, these packages were delivered to the defendant— thirty-five of them on the 12th day of May, 1870, and the remaining six packages on the day following—for transportation to La Crosse, which was the western terminus of defendant's line of railway; and they were transported by the defendant to La Crosse—the thirty-five packages reaching there on the morning of May 13th, and the other six packages on the following morning.

It was the custom and usage of the defendant to forward from La Crosse all goods consigned to Winona, by the steamboat "Keokuk," a boat owned and operated by the "Northwestern Union Packet Company," which company was a common carrier on the Mississippi river. The Keokuk made daily trips from La Crosse to Winona and back to La Crosse, usually leaving the latter place at 8 A. M., and returning there at about 7.30 P. M. On her return she was accustomed to receive from the defendant all freight for Winona which was ready for shipment, sometimes taking it on board in the evening and sometimes not until the following morning.

Between the railroad track and the river, at La Crosse, there were certain warehouses owned and controlled by the defendant, from which goods were

shipped on board the Keokuk, and other steamers, and into which goods were received from such steamers. All goods received into such warehouses were distributed to different portions thereof, according to their destination. A portion of each warehouse was devoted to freight consigned to Winona, and such portion was designated by a sign or card attached to that part of the building labelled "Winona." Soon after the arrival of the plaintiff's goods at La Crosse, and on the same day, they were taken from the cars by the defendant, and placed in one of these warehouses, in the part thereof so set apart for Winona freight, for shipment on the Keokuk. The defendant had no interest whatever in the Packet Company which owned and operated the Keokuk, and there was no special contract between the plaintiff and the defendant concerning the transportation of these goods from Watertown to La Crosse.

The custom and usage of business at La Crosse, between the defendant and the Packet Company, in respect to the shipment of goods arriving there by the defendant's railroad, and consigned to points on the river, was briefly as follows: On the arrival of such freight, the waybills accompanying the same were copied into the in-freight book of the defendant, and entered by the yard master in the train book. The freight was then checked into the warehouse of the defendant, and distributed to its appropriate place therein, according to its destination. Bills of lading for the consignees were then made out from such way bills, and from these bills of lading two tally-books were made—one for the check clerk of the defendant, and the other for the steamboat which might take the goods; and then the freight was ready to be delivered to the steamboat. This was all done by the employees and agents of the defendant.

The goods were then taken from the warehouse by the employees of the Packet Company, and placed on the boat, the second clerk of the boat and the check

clerk of the defendant attending with the tally-books to verify the correctness of the shipment. After the freight was on board, the clerk of the boat signed each page of the manifest book, which had previously been made by copying into it the bills of lading of the goods thus shipped, and was furnished with a copy thereof. After the freight was deposited in its appropriate place in the warehouse, it was handled entirely by the crew of the steamboat. It was not the custom and usage for the agents of the defendant to give actual notice to the Packet Company, of the arrival of freight at La Crosse, for different points on the river; but the boats called at the warehouses of the defendant for such freight on their regular trips, taking all that was ready for shipment.

It would seem, from the testimony, that the goods of the plaintiff which had then arrived were not ready for delivery on board the Keokuk when she left for Winona on Saturday morning, May 14th, because the bills of lading and manifest thereof had not been made. They were completed, however, as respects the thirty-five packages, when the boat returned that evening. The remaining six packages were never manifested.

The Keokuk returned to La Crosse at the usual time on Saturday evening, unloaded her down freight, and, after doing some towing, laid up at a wharf near where another steamboat, the " War Eagle," was taking on freight from the warehouse in which plaintiff's goods were stored. While the two remained in this position, and about one o'clock in the morning of Sunday, May 15th, the War Eagle took fire, the flames communicated to the warehouse, and the same and all its contents, including the goods of the plaintiff, were speedily consumed.

This action was brought to recover the value of these goods, and the plaintiff had a verdict and judgment in the circuit court. The defendant has appealed from such judgment to this court.

It is freely conceded that the goods were not lost through any fault or negligence of the defendant or its agents or employees; and that, unless the defendant can be held liable for the loss as a common carrier, it cannot be held liable at all.

The position of the plaintiff is, that there was no suspension of the liability of the defendant as a common carrier in respect to the goods of the plaintiff after they arrived at La Crosse; that such liability necessarily continued until the goods should actually be delivered to the Packet Company; and that, inasmuch as they were destroyed before such actual delivery, the defendant is liable to the plaintiff for their value.

The circuit court judge adopted this view of the law; and while he submitted it to the jury as a question of fact, whether there had been an actual delivery of the goods by the defendant to the Packet Company, he instructed them that either the defendant or the Packet Company was liable for the goods as a common carrier; that there was no evidence which would authorize them to find that the liability of the defendant was that of warehouseman only; and that, after the goods were placed in the warehouse, there was no suspension of the strict liability of a common carrier in respect thereto.

The position of the defendant is, that after the plaintiff's goods were unloaded from the cars and placed in that portion of the warehouse set apart for Winona freight, ready to be taken therefrom by the connecting carrier, the Northwestern Union Packet Company, as was the uniform custom and usage in such cases, the liability of the defendant as a common carrier ceased, and from thenceforth, if liable at all, it was only as a warehouseman and forwarder, and not as a common carrier.

Conceding, for the purposes of the argument, that the placing of the goods in the warehouse in the portion thereof from which the connecting carrier was

accustomed to take goods consigned to Winona, was notice to such carrier that they were there awaiting transportation by its boat to Winona, and conceding also that the bills of lading, tally-books and manifests had been made, and that the goods were ready to be put on board the Keokuk, and were so ready before that boat returned to La Crosse on Saturday evening before the fire, still there is no evidence of an actual delivery of the goods to the Packet Company. At the time they were burned, no bill of lading or tally-book thereof had been delivered to, and no manifest had been signed by, the agents of the Packet Company; neither had that company exercised any control over the property. The goods were held by the defendant either in the capacity of a common carrier or in that of a warehouseman. The most that can be successfully claimed by the defendant is, I think, that the goods were in its warehouse ready to be delivered to the Packet Company whenever its boat should call for them.

However the fact may be, there is certainly evidence tending to show that the thirty-five packages which arrived at La Crosse on Friday morning, were ready, before they were consumed, for delivery to the Packet Company.

On this state of facts, the controlling question which we are to determine is, whether the undisputed evidence demonstrates that the defendant is necessarily chargeable as a common carrier for the loss of the plaintiff's goods. If it is so chargeable, the judgment of the circuit court should be affirmed. If it is not necessarily so chargeable, then such judgment should be reversed.

The liability of a common carrier of goods after they have reached their destination and are awaiting delivery to the owner or consignee, has been adjudicated by this court in *Wood v. Crocker*, 18 Wis. 345. It is held in that case, that where goods are transported by a

railroad company to the place of consignment, and there deposited in its warehouse, the liability of such company as a common carrier in respect to such goods does not thereby cease, but continues until the same are ready for delivery to the owner or consignee thereof, and until he has had a reasonable opportunity to take them away.

There is doubtless much conflict of authority on this subject, but the rule there adopted was thought by the court to be sustained by the sounder reason, and to accord best with well settled principles of public policy. We are not disposed to disturb that rule, and it is entirely unnecessary to refer to the authorities which hold a different doctrine.

I think that the same rule should be applied here. I can see no difference in principle between a case where the transit is ended and the carrier holds the goods for delivery to the owner or consignee, and one where the carrier conveys the goods over a portion only of the route, and holds them for delivery to some connecting carrier. For the purpose of receiving such delivery, I think the connecting carrier must be held to be the agent of the owner. *Schneider v Evans*, 25 Wis. 241. I find no adjudicated case which makes any such distinction, although in *McDonald v. Western Railroad Corporation*, 34 N. Y. 497, Mr. Justice HUNT does say that there is an important difference. This is a mere passing remark, however, no explanation of the grounds of difference being stated, and no authority cited in support of the proposition. Besides, the question as to whether any such difference existed was of very small significance in that particular case. It is true, the defendant in that case was held liable as a common carrier; but had this been ruled otherwise, the carrier was evidently guilty of gross negligence in not forwarding the goods in due time, and would doubtless have been held liable as a forwarder for the value of the lost goods.

The cases cited by counsel for the plaintiff to show that the liability of the carrier, as such, does not cease until an actual delivery of the goods to the next carrier, fail, I think, to establish that proposition.

*McDonald v. Western Railroad Corporation, supra,* and *Goold v. Chapin,* 20 N. Y. 259, assert the opposite doctrine.    See opinions of SMITH, J., in the former case (p. 502), and of STRONG, J., in the latter case (p. 267).

In *Miller v. Steam Navigation Co.,* 10 N. Y. 431, and in *Hooper v. Chicago & N. W. R. R. Co. [ante,* p. 81]; and also in *Goold v. Chapin, supra,* it was held that the transit was not ended.    In *Blossom v. Griffin,* 13 N. Y. 569, and in *Ladue v. Griffith,* 25 N. Y. 364, the goods had been delivered to the carrier for transportation, and were destroyed *before* the transit commenced.

*Lawrence v. Winona & St. Peter's R. R.,* decided by the supreme court of Minnesota and yet unreported, seems to turn upon the point that the railroad company had made a contract with some person to give him the exclusive transportation of all of the freight received by it, for the point to which the goods of the plaintiff in that action were consigned, not to be transported by such person at stated times, but only when a certain quantity of freight had accumulated; and that, before the specified quantity had accumulated, and five days after the goods were placed in the warehouse of the railroad company, they were destroyed by fire.    The company was held liable as a common carrier, because under such contract it had deprived itself of the right to forward the goods.    But it is not held in that case that the liability of the carrier, as such, must necessarily continue until the goods are actually delivered to the next carrier.    Hence, whatever some of the judges may have said in their opinions, none of these cases decide that the liability of the carrier, as such, necessarily continues until an actual delivery of the goods to the next carrier.

I refer to these cases to show that they are not neces-

sarily in conflict with the rule which we adopt in this case. Indeed, all of the cases seem to agree that when the carrier who conveys the goods, gives notice to the next carrier to take them, if the latter fail to do so within a reasonable time, the former may place them in his own warehouse, and from that time his liability is only that of a warehouseman. None of these cases hold that such notice to the next carrier must be an actual written or verbal notice. The better opinion seems to be, that the notice may be implied from the course of dealing between the parties, or from the custom and usage of the business. But the case of *Wood v. Crocker, supra,* does not require that notice shall be given to the owner or consignee of the arrival of the goods, before the strict liability of a common carrier shall cease. It is sufficient if the goods are ready for delivery, and the reasonable time for the owner to remove them has elapsed.

In the latter case, Justice Cole explains what is a "reasonable time" or "reasonable opportunity" to remove the goods. Keeping in mind the proposition that the Packet Company was the agent of the plaintiff to receive his goods from the defendant, that explanation, as applicable to this case, is, that the Packet Company was bound to remove the goods from the warehouse of the defendant at the earliest practicable time after the defendant was ready to deliver them, and such time is not to be measured by any peculiar circumstances in the situation or condition of the Packet Company rendering necessary for its convenience that it should have a longer time or a better opportunity to take the goods. It was part of the implied contract for transportation between the plaintiff and the defendant, that the Packet Company should receive the goods at La Crosse at the earliest practicable time after the defendant was ready to deliver them, and if such time had elapsed before they were burned, and the Packet Company was not ready to receive them, then and in

such case the defendant held them under the more limited liability of a warehouseman at the time they were destroyed. Subject to these legal principles it is for the jury to say, from all of the circumstances of the case as proved upon the trial, whether such reasonable time to remove the goods had elapsed before they were burned.

I have already said that the controlling question in the case is: Does the uncontradicted evidence demonstrate that the defendant is necessarily chargeable as a common carrier with the loss of the plaintiff's goods? In the light of the propositions of law which have been stated, I think that this question must be answered in the negative. The testimony fails to inform us at what precise time the thirty-five packages which reached La Crosse on Friday morning, were ready for delivery to the Packet Company; and it also fails to show for whose convenience the War Eagle was first loaded on Saturday evening; but it tends to show, as already stated, that the thirty-five packages were ready for delivery on board the Keokuk when she returned to La Crosse on Saturday evening. I am of the opinion that it should have been left to the jury to say whether any part of the goods were ready for delivery, and if so, whether, under all of the circumstances, the Packet Company had a reasonable time, before the fire, within which it might have removed the goods from the warehouse of the defendant.

That portion of the charge of the court to the jury to which these observations are mainly applicable, is as follows: "There is no evidence before you from which you would be authorized to find that the liability of the defendant was that of a warehouseman simply; nor is there any evidence from which you would be authorized to find that from the time the goods were placed in the warehouse until they were taken by the boats, there was any intervening liability as for warehousing, or any suspension of the strict liability of common

carrier.   Either the railway company is liable as a common carrier, or the Northwestern Packet Company is so liable."

For the reasons already stated, we think that this portion of the charge was erroneous.

I am of the opinion, also, that the fourth and fifth instructions asked on behalf of defendant and refused by the court, should have been given.   They are as follows:

" 4. The plaintiff is presumed to have known the usages and general course of business prevailing between the defendant and the next succeeding carrier, as to notice of arrival of goods and delivery for further carriage, and he is bound by them.

" 5. The defendant was not bound to do any act further than in conformity to such usage, in the way of notice or tender of the goods to the next succeeding carrier."

I think that the learned counsel for the defendant, in his very able argument, has demonstrated that these propositions are fully sustained by the authorities.

*By the Court.*—The judgment is reversed, and the cause remanded for a new trial.