JOHN B. LAWRENCE,

*vs.*

THE WINONA & ST. PETER RAILROAD CO.

On the 11th of March, 1869, the defendants received plaintiff's goods marked "J. B. Lawrence, Mankato, Minn.," at Winona, from carriers between LaCrosse and that place, and the next day transported them to Waseca, then the western terminus of their road, and on their arrival, in accordance with defendants' usual course of business, they were unladen and deposited in their warehouse, till they should be called for; and were therewith destroyed by fire on the 17th of March, not having been called for. There was then a connection by railroad between Owatonna

Lawrence v. Winona & St. Peter Railroad Co.

a point between said *termini* on defendants' road, and Mankato, by way of Mendota; but it was defendants' custom to send goods, marked for Mankato, by way of Waseca, unless specially consigned by way of Owatonna and Mendota, which plaintiff's were not, but were received by defendants without any direction other than above marks. Some months before, the defendants, being desirous that there might be established some freight transportation line between Waseca and Mankato, so as to thereby encourage the consignment of a larger amount of Mankato freight over their road, had requested one Phelps to put on a line of teams, and engage in the transportation of goods and merchandise between Waseca and Mankato, promising, that if he would do so, they would give and deliver to him all freight marked or consigned for Mankato, which might arrive at Waseca over their road, not otherwise ordered by the consignees, provided said Phelps would not charge the consignees or owners more than sixty cents per hundred pounds weight, for such transportation. And thereupon said Phelps had put on teams, and engaged in said business as a common carrier on said route, and continued so to do till after said fire. Defendants had no interest in the business, or in getting him to engage in it, except incidentally, from the fact that the existence of such a transportation line at reasonable rates induced more business to come over their road. Said business was thus conducted : whenever enough of such freight for Mankato had accumulated in said warehouse to make at least one load, and which had not been otherwise ordered by the consignees, said Phelps would send his team to Waseca for it. He had no regular time of making trips between Waseca and Mankato, but did so, when, and as often as there was freight enough to make a load or more. He had no place for receiving or storing freight at Waseca, but whenever called for by him, it was delivered to him by defendants into his wagons directly from their warehouse, in which it remained stored after its arrival at Waseca, till so called for, but defendants made no charge for such storage. Phelps did not call for or take away any goods or other freight from defendants' said warehouse, after the plaintiff's goods arrived, until after the fire, for the reason, that there was not enough for a load for a team. *Held*, that defendants' liability to plaintiff in respect of the said goods, at the time of the fire was that of a common carrier.

The defendants appeal to this court from the judgment of the district court for Blue Earth county. The opinion of the court contains a sufficient statement of the case.

MITCHELL & YALE for Appellants.

JUDSON JONES for Respondent.

*By the Court.*—RIPLEY, CH. J.—This action was brought to recover the value of five boxes of household goods, the property of plaintiff, which were in defendants' warehouse at Waseca, in this state, when on the 17th day of March, 1869, the said warehouse with its contents was wholly destroyed by fire.

At the trial in the district court for Blue Earth county, at December term, 1869,) the plaintiff had a verdict, and defendants moved for a new trial, on the ground that the verdict was not justified by the evidence, and was contrary to law, and also, of errors in law occurring at the trial and excepted to by defendants, which motion was denied, and judgment entered on the verdict, from which judgment the defendants appeal to this court.

The following facts appear to have been either proved or admitted. The plaintiff, on the 2d March, 1869, at Fort Howard, Wisconsin, shipped said goods on the Chicago and Northwestern Railway, taking the following receipt:

"Fort Howard, Wisconsin, March 2d, 1869.

Received from J. B. Lawrence, in apparent good order, by the Chicago and North Western Railway Company, to be transported to Watertown, Wis., the following articles, as marked and described below, subject to the conditions and regulations of the published freight tariff of the said company, it being expressly agreed and understood, that the said Chicago and North Western Railway Company, in receiving the said packages to be forwarded as aforesaid, assume no other responsibility for their safety, than may be incurred on their own road.

Marks and consignee.

> J. B. Lawrence, Mankato, Minn.

Description of articles as given by consignee; 5 boxes H. H. Goods.

> W. E. Peak, agent. "

On the 11th day of said March, the defendants received said goods at Winona, from Seavey & Co., the then transportation company between La Crosse and Winona. Defendants were then a corporation, duly incorporated under the laws of this state, and the owners of a railroad therein, known as the Winona & St. Peter Railroad, extending from Winona aforesaid, to Waseca aforesaid, and common carriers for hire upon said railroad. There was then a railroad connection between Owatonna, a point between said *termini* on defendants' road, and Mankato, by way of Mendota. It was then the invariable custom of defendants to ship freight marked as consigned to Mankato, by way of Waseca, unless it was specially consigned by way of Owatonna and Mendota.

Plaintiff's goods were not so specially consigned, but received by defendants without any special directions given by any one, as to the route by which they were to be conveyed, or any direction, other than that they were marked, "*J. B. Lawrence, Mankato, Minnesota.*"

Said goods were forwarded by defendants on the 12th March, 1869, to Waseca, where they arrived the same evening, and were unloaded and placed in said warehouse, which was the defendants' only freight depot, where they remained without being called for by the consignee, or any other person, till they were destroyed as aforesaid. The said building was constructed and arranged in the usual manner in which depots or station houses are built in Minnesota.

Defendants gave no notice to plaintiff of the arrival of

said goods at Waseca, and there is no evidence tending to show that they knew what his then place of residence was, which appears from the evidence in the case to have been at Chippewa City, Wisconsin.

Defendants' usual course of business, as to freight for Mankato, was to unload it the same night it arrived, and store it in said warehouse till called for.

Defendants admitted that S. S. Phelps, if produced as a witness, would testify as follows: "During the year 1868, and about the month of December, and when the western terminus of defendants' road was at Waseca, the defendants being desirous that there might be established some freight transportation line between said Waseca and Mankato, so as to thereby encourage the consignment of a larger amount of Mankato freight over defendants' road, solicited said Phelps to put on a line of teams, and engage in the transportation business between Waseca and Mankato, and stating, as an inducement, that if he would do so, they would give and deliver to him all 'Mankato freight,' which might arrive at Waseca, over their road, not otherwise ordered or directed by the consignees, provided said Phelps would not charge the consignees, or owners of the freight, over sixty cents per hundred pounds for transportation from Waseca to Mankato; the said Phelps thereupon put on teams on the route between Waseca and Mankato, and engaged in the business of the transportation of goods and merchandise, between these points, during the winter last past (1868-1869.) The manner of conducting the business was as follows: Whenever enough of Mankato freight had accumulated in the defendants' depot at Waseca, to make at least one load, and which had not been otherwise ordered by the consignees, said Phelps would send his teams to Waseca, and call for the said freight; upon his application defendants'

station agent would deliver such freight to him, or his teamsters, he signing a receipt therefor.

The freight money or back charges on such goods due defendants, were either paid by, or charged to him on defendants' books, upon delivery of the goods, he becoming personally responsible to defendants for such freight and charges. The defendants had no control over the teams, or employees of Phelps engaged in said transportation business, nor over the times when he should call for freight. He had no regular times of making trips between Waseca and Mankato, but was in the habit of doing so, when, and as often as there was freight enough to make a load, or more. The defendants were not to pay Phelps anything, or in any way become responsible to him for the transportation of freight, he having to look for his own pay, and back charges advanced by him to defendants, solely to the consignees or owners of the freight, which he usually collected of them at Mankato, on delivery of the goods.

Defendants had no interest in, nor received any part of the moneys earned in the transportation of freight between Waseca and Mankato, nor did they make any charge for storage on such freight, while in their warehouse at Waseca awaiting transportation. Phelps had no warehouse or other place for receiving or storing freight at Waseca, but whenever called for by him, it was delivered to him by defendants' station agent, into his wagons directly from the warehouse of defendants, in which it remained stored until so called for. He did not call for or take away any goods or other freight from defendants' warehouse at Waseca, after the arrival of plaintiff's goods at that point, until after the burning of the warehouse or depot, for the reason that there was not enough for a load for a team.

By "Mankato freight" he means freight marked or con-

signed to Mankato.   Defendants had no interest in getting
Phelps to engage in the transportation of goods between
Waseca and Mankato, nor any interest in carrying on such
business, except incidentally from the fact, that the existence
of such transportation line, at reasonable rates, induced
more business to come over their road.   Phelps' custom
was, when freight arrived at Mankato, if it belonged to busi-
ness men in Mankato, to take it directly to their place of
business and deliver it: if it belonged to those who had no
place of business there, he stored it in Shawbut's warehouse
in Mankato."

. Upon the foregoing facts, the truth of what Phelps would
have stated being assumed, we think it has no tendency to
prove, (as claimed by respondent,) that Phelps was an em-
ployee of defendants, and his teams a continuation of de-
fendants' transportation line.   Further to support the issue
in this behalf, however, the plaintiff introduced, the defend-
ants' objection thereto being overruled by the court, the tes-
timony of the Mankato warehouseman, Shawbut; of one
Palmer, who succeeded him in such business, (for the pur-
pose of proving Phelps' custom, or manner of doing business
at Mankato;) also, the declaration of one Mead, defendants'
general freight agent; also, the receipt, [exhibit B,] and
eight papers of like form, dated between May 25, and June
26, 1869.

The material portion of said testimony with reference to
plaintiff's claim is as follows : Shawbut testified, that Phelps
hauled goods all winter, and until he, (Shawbut,) turned
over the warehouse to Palmer; that exhibit B, was the
usual form of way bill, or receipt which accompanied the
goods which Phelps stored with him.

Exhibit B, is in the words and figures following:

Lawrence v. Winona & St. Peter Railroad Co.

"H. Hampton, St. Peter,
                To Winona & St. Peter Rail Road,   Dr.
Way bill 126, ⎱  For transportation of freight from Owa-
From Car 166. ⎰  tonna to Waseca.

| No. Pack. | Descript'n of Articles. | Weight. | Rate. | Freight. | Adv. Charges. | Total |
|---|---|---|---|---|---|---|
| 1. | Stand. | 20. | 5. | 30 cts. | 75 cts. | $1.05 |
|  |  |  |  |  | Teams, | .50 |
|  |  |  |  |  |  | $1.55 |

            Received payment,
                        H. J. Wadsworth, agent."
He (Shawbut) received these bills of Phelps, and paid
Phelps, and collected them afterwards of the parties.   The
charge for hauling goods from Waseca was 60 cents per 100
pounds.   "I do not remember," he says, "of receiving
any letter from H. J. Wadsworth relating to storing goods
for defendants; I never received any letter from any agent
of defendants concerning the warehousing of goods.   There
was never any arrangement between me and defendants in
regard to storing goods freighted over defendants' road.   It
was generally known that I was in the warehouse business,
and when goods came to me, I took them.   I took goods
that Phelps brought me the same as from any one else.   I
continued to receive such goods until I rented my ware-
house to Palmer, which was in April or May last.   Phelps
brought teams over once a week, and sometimes oftener,
sometimes as many as two or three teams at a time.   He
always showed his receipts when he left goods.   He usually
left some goods with me whenever he came over.   I always
charged storage to persons who stored goods with me."

J. W. Palmer  stated that he leased Shaubut's warehouse
about last of April, or first of May, 1869.   Phelps was then

hauling freight, and did so for some months after. "Phelps came five or six times while I had charge of the warehouse. He usually left some freight with me accompanied with waybills. 'Exhibit B' is similar to those that he left with the goods." (Here eight papers of like form with Exhibit B were shown to witness, all dated between May 25th and June 26th, 1869), which he said were papers which Phelps left with him with the goods. "I stored the goods referred to in these bills. They were delivered to me by Phelps. Phelps' charge averaged about sixty cents per hundred pounds." On cross-examination, this witness stated, that he might have received some bills from Phelps that had not the word "team" on it, and also, that "the bill I hold in my hand has not the word 'team' on it; it is one I received from Phelps. I don't remember receiving but one bill from Phelps without the word '*team*' on it; there might have been others." Re-direct. "The bill I refer to, as received without the word 'team' on it, is signed 'L. W. Rowley, agent.'"

J. F. Wallace, a grocery merchant in Mankato, testified, that about December, 1869, said A. J. Mead asked him to ship freight over their road. "I told him freight was too high from Waseca to Mankato, but if that could be remedied, I should ship more goods that way. He replied, that is just where the thing hangs; if more goods were shipped that way, it might enable us to secure a reduction of rates of freight to Mankato. He also said he would try to get rates reduced, and asked me to use my influence to have freight pass over their road."

He also stated that he received goods from Phelps at his store in the winter of 1868-9, and one of said bills dated June 20, being shown him, that the same was similar to those he received.

The evidence of Phelps' manner of doing business at Mankato, should have been excluded. Unless he was the defendants' agent, it was irrelevant; and before the act of B can be given in evidence as the act of A, it must be proved that B was the agent of A. (*Starkie, Pt. 4, p.* 55.) The plaintiff claims, indeed, that the evidence in question itself tends to prove this; but the agency of a party must be proved from other evidence than his acts, before it can be shown that his acts are binding upon his alleged principal. *Scott vs. Crane,* 1 *Conn.* 255. B's authority to act for A, may be inferred from the habit and course of dealing of A and B, but not of B alone, even though his acts be done in A's name. (*Starkie, Pt.* 4, 55, 59.) In this case Phelps did not assume to act in the name of the defendants. Plaintiff would infer Phelps' agency, from the fact that the way bill, which he usually left with the goods, was signed by defendants' freight agent, and included a charge for team, as well as railroad charges.

The bearing of the way-bill was Phelps' act; its delivery to him was the act of defendants' freight agent. On its face, it purports to be for transportation to Waseca only, and its delivery, receipted by the station agent, to Phelps, (it appearing, according to the evidence introduced by plaintiff himself that the freight was delivered to Phelps by the station agent, upon his receipting therefor, and either paying or becoming personally responsible to defendants for the freight money, and back charges due them,) tends of itself to prove, that such goods, and way-bill were delivered to him, not as defendants' employee, but as the agent of the consignees. It appears, however, that these way-bills, usually, but not always, included a charge for "*team*," additional to defendants' dues, which is said, though of this there is no proof, to be for hauling from Waseca to Mankato.

Whether added by the freight agent, and if so, at whose direction or request, or by Phelps himself does not appear; but at all events, there is no inference from the circumstances, that Phelps received the bill as defendants' agent, to collect the amount for them, and on their account, for the plaintiff has himself introduced positive testimony, that the defendants had no interest in, nor received any part of the moneys received on the transportation of freight between Waseca and Mankato. The evidence of Palmer was inadmissible for the further reason, that he testified only to facts occurring after the fire; and Phelps' way of doing business at Mankato in May, could have no tendency to prove what it was in March. Mead's declarations, though of themselves, indeed, they rather go to show that defendants had no control over the rates of freight between Waseca and Mankato, yet were inadmissible in any view. They did not tend to prove any contract with plaintiff, or any usage of defendants. There is no evidence, either that the matters in question were within the scope of his agency, or that the declarations were in regard to a transportation then depending so as to be part of the *res gestae.* 1 *Greenleaf Evid. Sub.* 113.

We think, however, that there is competent evidence in the case tending to show that Phelps was an independent common carrier. In that case, defendants were intermediate carriers between Fort Howard and Mankato. If they were, were they under any responsibility to plaintiff, at the time of said fire, in respect of such goods? If so, what was it?

It is held in England, and in some of the states, and is laid down by Mr. Angell, that persons receiving goods as common carriers, continue to be responsible, in that capacity, until the goods are delivered at the place to which they are

directed, though it is beyond the limits of the place to which they are accustomed to carry and deliver ; (*Angell on Carriers*, § 95, 4th *Ed.*, 1868. *Muschamp vs. Lancaster & Preston, Railway*, 8 *M. & W.*, p. 421. *Bennett vs. Filyan*, 1 *Fla.*, 403. *Choteaux vs. Leach*, 18 *Penn. St.*, 224. *Ill. Cent. R. R. vs. Johnson*, 34 *Ill.*, 389;) that by receiving goods marked for places beyond their route, they are impliedly bound to see them carried to their destination. *Muschamp v. Lancaster & Preston Railway*, 8 *M. & W.*, 421. *Watson vs. Ambesgate, Nottingham & Boston Railroad Co.*, 3 *Eng. Law & Equity Rep.*, 497. *Ill. Cent. R. R. vs. Johnson*, 34 *Ill.*, 389. But this rule applies to the first carrier only, and not to any subsequent, or intermediate carrier. The contract is held to be exclusively with the first carrier, and there is no right of action in favor of the owner against any of the subsequent carriers on the route, even where the loss is shown to have occurred on one of the subsequent roads on the route. *Bristol & Exeter Railway vs. Collins*, 5 *Hurlston & Norman*, 969. It is said in an able article in support of the rule, that "this liability of the first carrier who receives the goods, may truly be called the bond upon which the consignor invests, and as the first carrier is the only party he deals with, so he must be the only party to whom he can resort for the condition of his bond." 2 *Am. Law Review*, p. 440.

Upon this view of the law, as plaintiff's contract was with the Chicago & Northwestern Railroad, his only remedy would be against them, even though the terms of their receipt would be a bar to any action against them. *Coxon vs. G. W. R. R. Co.*, 5 *Hurlstone & Norman* 274. *Bristol & Exeter Railway vs. Collins do. p.* 969.

On the other hand, it is stated by Judge Redfield, that the general view of the American cases, and the more just and

reasonable rule, and the doctrine which seems likely to prevail in this country, is that laid down in the earlier English cases, viz: that in the absence of special contract, the carrier is only liable for the extent of his own route, and for the safe storage and delivery to the next carrier. 2 *Redfield on Railways*, ch. 26, sec. 14, § 180, 2, and cases cited. *Garside vs. Trent & Mersey Nav. Co.*, 4 *T. R.*, 581.

So Story states, "That the American rule probably is, that if the carrier receiving the goods has no connection in business with another line, and receives pay for transportation only on his own road, he is not liable in the absence of any special contract, for a loss beyond his own line; and the simple receipt of goods directed to a place beyond, does not, *prima facie*, create a contract to carry such goods to their final destination." *Story on Bailments, Ed.* 1863, § 538. The rule laid down in *Garside vs. Trent & Mersey Nav. Co.*, that each carrier, in the absence of special contract, is only liable to the extent of his own route, and the safe storage and delivery to the next carrier, is said by the supreme court of Vermont, (23*d Ver.*, 186,) to be "undoubtedly the better, the more just and rational, and the more generally recognized rule upon the subject," and what is called the "American rule," seems to be based on that case. See 2 *Redfield on Railways, supra, and Thomas vs. Bost. & Prov. R. R.*, 10 *Met.*, 472. The question is new in this state, but after giving it all the consideration due to its great interest and importance, we feel ourselves constrained to take our place with the adherents to the "American Rule," as above stated. But though he is not liable beyond his own route, yet, if at the end of the route, the carrier stores the goods in his own warehouse, without delivery, or notice, or attempt to deliver to the next carrier, he is not, by such mere act of storage, released from liability

as a carrier. *McDonald vs. W. R. R.*, 34 *N. Y.*, 497, 500.

In *Garside vs. Trent & Mersey Nav. Co.*, the defendants were common carriers between Stonepoint and. Manchester. Plaintiff's goods were taken at Stonepoint to be carried to Manchester, and from Manchester by another carrier to Stockport, and by agreement, they were to be kept in defendants' warehouse without charge, and to be kept till called for by the carrier for Stockport; and it was held, that their duties as carriers ended with the storage of the goods; and that they were thereafter in the situation of · warehousemen only. Buller, J., remarked, "the keeping of the goods in the warehouse is not for the convenience of the carrier, but the owner, for when the voyage to Manchester is performed, it is the interest of the carrier to get rid of them directly, and it was only because there was no person at Manchester ready to receive these goods, that the defendants were obliged to store them. "

The defendants contend that the facts in the case at bar bring it strictly within the doctrine in the above case. Though the defendants did not deliver the goods, there was, they say, no opportunity to deliver them; for Phelps did not call for any while they were stored in their warehouse; nor had he any place for their receipt. The goods, it is said, were stored, not for defendants' convenience, but because there was no one to receive them, or to whom they could be delivered.

But this, it seems to us, assumes the very point upon which the question turns. In *Garside vs. Trent & Mersey Nav. Co.* the storage was for plaintiff's convenience, because by agreement with him, the defendants had precluded themselves from delivering them to the next carrier elsewhere than at their warehouse. They were bound to keep them there till called for. It is true, that the defendants in

the case at bar, had a right to presume that the plaintiff intended they should transport and dispose of the goods in the usual way, and that the contract between them would be implied to be, that defendants were only bound to transport and deliver them according to the established usage of the business, whether plaintiff knew it or not; [*Van Santvoord vs. St. John*, 6 *Hill*, 157]; that established usage, too, included the storage in defendants' warehouse, until enough freight having accumulated for a load, Phelps should call for them. It may be said then to have been by agreement with the plaintiff, that the defendants so stored the goods; but it would not follow from that circumstance, that such storage was for *his* convenience. They were as much bound in respect to Phelps, by the custom of conducting business as the plaintiff to them.

By their agreement with Phelps, they had precluded themselves from delivering the goods to any other carrier than himself, and by their customary mode of doing the business with him under that agreement, they were bound to keep such freight for him as aforesaid. Phelps never received the goods till enough had accumulated for a load, and was not bound to receive them sooner. Defendants never delivered, and could not insist on delivering them sooner, and the plaintiff's goods were destroyed because of this arrangement; for the case finds, that Phelps had not called until after the fire, because *there was not enough for a load*. It makes no difference, if the fact were so, though that does not appear, that there was no other carrier at Waseca than Phelps to whom the goods could have been sooner delivered. There was another independent line for Mankato connecting with defendants' road by rail at Owatonna; but defendants' established usage, was to forward them by Phelps via Waseca. By this usage plaintiff of course was

bound; but was this custom, and this agreement with Phelps under which plaintiff's goods were so disposed of, for *plaintiff's* convenience? Surely not. The arrangement with Phelps was made by defendants in their interest, and for their benefit, viz: to procure the consignment of a larger amount of Mankato freight over their road.

The general interest of carriers is, as Mr. Justice Buller says, "to get rid of the goods directly the journey is performed." But here, the expected benefit above mentioned, had made it defendants' interest to make arrangements which necessarily included a temporary retention of the goods by them. It is as if defendants, on receiving plaintiff's goods, had said: we intend, instead of sending your goods to Mankato, via Owatonna, to transport them to Waseca, keep them in our warehouse till enough such freight has accumulated for a load, and then deliver them to Phelps, to whom alone we have agreed to deliver them, in consideration of his putting on teams, and engaging in the transportation of freight between Waseca and Mankato at our request, and for our benefit; and plaintiff assents.

But it is not *his* convenience that is consulted in this arrangement, but that of the defendants. They carried the goods past Owatonna to Waseca, and stored them there for their own convenience, and for the purpose of, and until delivery to Phelps, under their arrangement with him; such storage was but an accessory to defendants' carriage; simply one step on their established course of the transport and delivery of such goods, which were still in transit, and defendants' liability as carriers in respect thereof, still existed when they were burned. 3 *Kernan*, 569. 34 *N. Y.*, 497, 506. 6 *Hill*, 157. With regard to the release set up in the answer, we do not think the case discloses any evidence tending to show that the plaintiff ever executed it. It is not therefore necessary to consider its effect.

It is unnecessary, also, to consider the other questions raised, and arising on the rulings and charge of the court, for the evidence shows, in our opinion, as matter of law, that defendants' liability, at the time of the fire, was that of common carriers ; supposing them, that is, to be intermediate carriers between Fort Howard and Mankato, which, we think, the evidence was competent to establish ; Phelps' teams, being, in our view an independent line of carriers between Waseca and Mankato.

The judgment of the district court must therefore be affirmed.