Swing, J.
(orally).
This cause is now submitted to the court as against the Chicago & Alton Railway Company alone, no claim being made upon the evidence against the Cleveland, Cincinnati, Chicago & St. Louis Railway Company.
The evidence shows that plaintiff on May —, 1903, shipped by the defendant, the Cleveland, Cincinnati, Chicago & St. Louis Railway Company, a piano to J. F. Walker, at Joplin, Mo. The Cleveland, Cincinnati, Chicago & St. Louis Railway Company carried the piano to St. Louis, Mo., and there transferred it to the Chicago & Alton Railway Company, a connecting line, to be carried by it to Kansas City, Mo. That company carried the piano to Kansas City in safety. It reached Kansa's City *586 May 29, at night. May 30 was Memorial Day, a National holiday and Sunday. On that day, but after about • — 'hours from the arrival of the piano at Kansas City, it was transferred by the Chicago & Alton to the Kansas City Southern Railway Company to be carried to Joplin and a receipt for it was given by the Kansas City Southern. Very soon after it was received by the Kansas City Southern and before it could be shipped out to Joplin there came a great, extraordinary, sudden flood in the Kaw river at Kansas City, a very destructive flood, and that made it impossible to get the piano out of the city until the flood abated, and the car in which the piano had been placed was flooded and the piano damaged by the water.
After the waters had abated, the Kansas City Southern, apparently because of the damaged condition of the piano, chose not to carry it on to Joplin and returned it to the yards of the Chicago & Alton. The Chicago & Alton refused to receive it and sent it back to the Kansas City Southern, which company refused to receive it back and returned it again to the Chicago & Alton, which company then received it and placed it in its freight warehouse, where it remained about nine months. The Chicago & Alton gave plaintiff no notice that it had received the piano back, and plaintiff, though making diligent effort, as the evidence shows, by correspondence, to ascertain what had become of the piano, was unable, during the period of nine months, to learn anything about it. At last it was found by plaintiff in the freight house of the Chicago & Alton.
The greater weight of the evidence shows, I think, that while the piano was damaged somewhat by the flood, it could have been repaired and made practically as good as new, at a small cost, $15 to $20 or $25, if it had received attention promptly after the flood, but that by being left in the freight house so long a time in the condition it was in after the flood, it so deteriorated in value, became in such bad condition, that it was practically worthless when found — could not be placed in good condition again. • ,
The evidence shows that if plaintiff had received notice *587 promptly after .the flood of the whereabouts and condition of the piano it could have been repaired it and put it in condition.
It is claimed by the plaintiff that the Chicago & Alton Railway_ Company is liable in damages, first, because it was- negligent in not having delivered the piano to the Kansas City Southern sooner than it did and in time to have enabled that company to ship it out of Kansas City before the flood came, and, second, because the Kansas City Southern refused to receive the piano from the Chicago & Alton, so that it never did pass out of the hands and control of the Chicago & Alton, and that that company kept it the entire nine months without notice to plaintiff of its whereabouts.
I am of opinion from all the evidence on the subject that the Chicago & Alton Railway Company did deliver the piano to the Kansas City Southern Railway Company on the morning of May 30. It was taken to the yards of that company at that time and a receipt for it was given. I am also of opinion that it was delivered in a reasonable time, that there was no negligence on the part of the Chicago & Alton in not having delivered it sooner, that it was not the fault of the Chicago & Alton, or of either company, that it was caught in the flood. The flood was so sudden and extraordinary and unprecedented that it can not be said that in the exercise of ordinary care it should have been anticipated.
As to the question as to whether there was any delivery to the Kansas City Southern, it being claimed that the piano never was received and accepted by the Kansas City Southern, I will refer to the evidence.
Walter II. ITeuer, freight house foreman for the C. & A., testified, and it is not contradicted, that on the morning of May 30 the car containing the piano was placed in the Kansas City Southern yards and he identifies a receipt that was given for it on that date. lie further testifies as follows:
“Q. When did the Kansas City Southern return this ear to the C. & A. Ry.! A. I can’t give you the exact time.
“Q. Well, approximately what time! A. It was in the *588 neighborhood of June 16. Or it may have been a day or two before that or a day or two after.
“Q. That was after the flood? A. Yes, sir.
“Q. "What did you then do with the car? A. I reported to Mr. Haskell, our agent, and he ordered me to recard it and send it back to the Kansas City Southern yards.
“Q. Did you do it? A. Yes, sir.
“Q. What then took place? A. Why, the car was taken from the freight house by the switchmen and put in their yards again, the Kansas City Southern yards.
“Q. Well, when did you see the car again? A. The twenty-second of June.
“Q. How did you happen to see the car on that day? A. Because in the morning when I got my car records I saw the card on this car and knew where it came from.
1 ‘ Q. Where had it come from when you saw it on the twenty-second? A. From the Kansas City Southern.
“Q. Why had they returned it? A. I don’t know right at the present time.
“Q. Well, did you know then? A. Why they wouldn’t accept flooded freight.
‘ ‘ Q. Now what did you do with the contents of that flooded car ? A. We unloaded it on the platform.
“Q. Did you see the piano then? A. Yes, sir.
‘ ‘ Q. What did you do with the piano then ? A. I put it in the house with the other flooded freight, in the freight house.
“Q. Of the C. & A. ? A. Yes, sir.
‘' Q. How long did the piano remain there, if you know ? A. Six months or more.”
He then testified that he looked at the piano several times after that, and that “Haskell came down one time and the claim clerk came down and we had to take the cover off and show them the condition it was in.” Haskell was the agent of the C. & A. at Kansas City.
This witness did say in one place, speaking of the car in which the piano was, “It was refused by the Kansas City Southern,” and in answer to the question, “why was it refused?” he said: “Because there was flooded freight in it, freight that had been through the flood.” But in same connection he said in answer to question, “Where was this car during the flood?” “In the Kansas' City Southern yards.” It is claimed by plaintiff, on *589 these statements of the witness, that the car never was accepted by the Kansas City Southern and therefore remained always in the care of the C. & A. But notwithstanding such statement of the witness, I think the fact that the car was placed in the Kansas City Southern yards and receipted for by the Kansas City Southern sufficient to show, if there were a controversy between the companies on that question, that it was accepted by the Kansas City Southern — and if this case turned on that question, I would so hold.
But the testimony I have quoted shows that after the flood and after some injury had been done by the water to the piano the Kansas City Southern determined to try to get rid of this piano and the car, and returned them to the C. & A. and did so a second time, when the C. & A. received them back and.took the piano out of the car and stored it in its freight house, where it kept it about nine months.5 The freight house man did this and showed the piano to Haskell, the agent, and to the claim clerk of the company. No notice was given to the consignor, and during all this time plaintiff, though diligent in efforts to find the piano, was unable to find it.
As I have said, I think the greater weight of the evidence is, that if notice had been given promptly the damages to the piano would have been light, $15 to $20, whereas as it was the piano was rendered worthless.
Now as to the law of the case touching the responsibility of the C. & A. for negligence in not giving notice under the circumstances.
In Hutchinson on Carriers'(2d Ed.), Seetion 103a, it is said:
“Where the succeeding carrier neglects or refuses for any reason or is unable to receive the goods, the first carrier must use reasonable diligence to notify the consignor or consignee and to take reasonable care to preserve the goods from injury while waiting instructions as to their disposition. If he fails to use reasonable diligence to notify the consignor or consignee, or if he leaves the goods exposed to danger he will be liable for their loss or injury. In either case his liability as carrier is not terminated. ’ ’
*590 I take it that in this case, although the Kansas City Southern did in fact accept the car and the piano, yet, when after the flood they attempted to repudiate that and return the car and .the piano to the C. & A. and the C. & A. recognized the refusal at that time of the Kansas City Southern 'to keep the ear and the piano- and received them back and took the piano out of the ear and placed it in its own freight house, it was under the same obligation to take reasonable care to preserve the goods from injury that it would have been if it had never delivered them to the Kansas City Southern, and was under the same obligation “t.o use reasonable diligence to notify the consignor or consignee” and that upon failure to use reasonable diligence it would “be liable for the loss or injury” of the piano.
In the same work, Hutchinson on Carriers, Section 104, it is said in speaking of the case of Conkey v. Raihvay, 31 Wis,. 619:
“But the court, in an able opinion by Dickson, C. J., held that the rights of the owner of the goods could not be affected by the delivery by usage and notice, as. was claimed when it was to be made by one common carrier to another for the purpose of continuing the transportation; and that in an action to recover for the loss in such cases proof of the actual possession by the defendant is conclusive against him. But it was said that between the carriers themselves the loss should be borne by the one in fault, and that there could be no doubt that if the one in fault be compelled to account for the loss he could compel an adjustment by the other by the proper legal remedy. The owner could never know where the fault lies, nor is it in his power in many cases to ascertain whether a delivery from one to’ the other has been made or not, if such delivery is made to depend upon circumstances other than an actual change of possession. As between the carriers themselves, however, it would, of course, be generally known who was in fault, and whether known or not, it would be more consistent with justice that they should settle between themselves upon whom the loss should fall, than that the owner who had sustained the loss should be put to the difficult task of finding out the truth at the risk of being defeated in his suit. He is, therefore, required to look no further than the a.c *591 tual' possession at the time of the loss; otherwise he might be the victim of a usage or a notice of which he had never heard. ’ ’
In the same work, Section 107, it is said:
“But it by no means follows that the owner of the goods may not recover for a loss from a connecting carrier to whom they have been only constructively delivered. He is not obliged to look to him but may pursue another in whom was the last actual possession. ’ ’
In the same work, Section 109, it is said:
“As has been said the owner loses sight of his goods when he delivers them to the first carrier and has no means of learning their whereabouts till he or the consignee is informed of their arrival at destination. At each successive point of transfer from one carrier to another they are liable to be placed in warehouses, there perhaps to be deláyed by an accumulation of freight or other causes and exposed to loss by fire or theft without fault on the part of the carrier or his agent. Superadded to these risks are the dangers of loss by collusions, cpiite as imminent while the goods are thus stored at some point unknown to the owner as while they are in actual transit. As a general rule the storage of the goods under such circumstances should be a mere accessory to the transportation and they should be under the protection of the rule which malees the carrier liable as an insurer from the time the owner transfers their possession to the first carrier until they are delivered to him at the end of the route.”
See, in this connection, McDonald v. Railway, 34 N. Y., 497, cited in Iiuthinson on Carriers.
The law thus stated in Hutchinson on Carriers is borne out by many authorities cited in the foot notes which I need not take the time to'refer to here.
In view of the facts as I have found them and the law as stated in Hutchinson on Carriers, which I take to be the law of this case, I am of opinion that, when the C. & A. received the piano back from the Kansas City Southern, whether it was bound to receive it or not, and placed it in a warehouse, it was its reasonable duty to notify the consignor that it had done so, just as if it had placed it in its warehouse without ever having *592 delivered it to the Kansas City Southern, and that upon its failure to do so for a period of many months, if the value of the piano was destroyed by that failure to give notice and by keeping the piano in the warehouse in its damaged condition for that length of time, the C. & A, would be liable to the owners for the loss.
Johnson & Levy, for plaintiff.
Harmon, Colston, Goldsmith <& Hoadly and Osear Stoehr, contra.
The testimony of witnesses at the trial showed the value of the piano when new — the figures I have not in my mind at this moment. The testimony was, that at an outlay of from $15 to $25 the piano after the flood could have been made about as good as new if it had received attention.
I think the plaintiff entitled to judgment for the amount of the difference between what it would have cost to put the pi'ano in good condition and what it would have been worth when so placed in condition.
Judgment will be rendered accordingly, but I am compelled to ask counsel to ascertain from the notes of the testimony the value of the piano as new, or good as new, as I am not able at this moment to recall it.