HEARD APRIL TERM, 1878.

CASE No. 656.

SPEARS & COLTON v. SPARTANBURG, UNION AND COLUMBIA RAILROAD COMPANY.

GEE & HUMPHRIES v. THE SAME.

THOMAS McNALLY v. THE SAME.

J. C. FARRAR v. THE SAME.

PHILIP M. COHEN v. THE SAME.

WM. A. NICHOLSON v. THE SAME.

WM. E. McNEACE v. THE SAME.

1. The liability of a railroad company as a common carrier does not extend over the whole time of the existence of their lien for freight.

2. A railroad company does not retain its character as a common carrier until notice of the arrival of the goods is given to the consignee, and he

has a reasonable time thereafter to remove them.    HASKELL, A. J., *dissenting.*

3. At what time the liability of a railroad company as a common carrier does terminate, not settled : WILLARD, C. J., *holding* that it ceases at the moment the goods have arrived at their place of destination, and are placed in a properly-constructed and guarded warehouse, subject to the demand of the consignee : (cases upon this subject reviewed and discussed) —McIVER, A. J., *holding* that the liability continues until the consignee has had a reasonable time, after the arrival of the goods, to remove them : HASKELL, A. J., *holding* that the consignee is entitled to notice of arrival and that the liability continues until he has had a reasonable time thereafter to remove his goods.

---

Before MACKEY, J., at Union, October Term, 1877.

The seven causes above stated were heard together on Circuit and in this court, and they all involve the same questions.

The Spartanburg, Union and Columbia Railroad Company is a common carrier ; as such it had received at its two termini the goods for the recovery of the value of which the above-entitled actions were brought. The goods in some of the above-stated cases were unladen from the cars on the forenoon of Friday, June 1st, 1877, in some on Saturday afternoon, June 2d, and in the others before either of the above-specified dates, and placed in the depot at the time of unlading—the freight charges thereon being unpaid.

During an extensive conflagration in the town of Union, in the said state, (not originating at the depot,) on the 3d day of June, 1877, the depot and its contents, including the goods above mentioned, were consumed.

It was in proof that no notice of arrival had been given to the consignees, and that the company required payment of freight charges before delivery. The plaintiff, Farrar, lived in Union county, fourteen miles from town ; all the other plaintiffs resided and did business in the town of Union.

The court charged the jury that unless there is a special exemption, in terms, of liability, brought home to consignee, a common carrier retains its character as a common carrier until notice of the arrival of the goods is given to consignee, and he

had reasonable time afterwards to take the goods; to which
defendant excepted.

The court further charged the jury that the liability of com-
mon carriers, as such, must extend over the whole time of the
existence of their lien for freight; to which defendant excepted.

The jury found verdicts for plaintiffs.

Defendants appealed upon the same grounds taken in their
exceptions to the judge's charge.

*Mr. James H. Rion,* for appellants.

1. We admit that if the goods were in the custody of the
defendant as *common carriers,* then the company is liable for
their destruction by an accidental fire.

2. If, however, the custody was that of *warehousemen,* then
the company, having proven that the fire occurred without fault
on its part, the defendant is not liable.    11 *Rich.* 339.

3. The whole question in this case turns, then, upon deter-
mining in what character the defendant had custody of the goods
when burnt—as *common carriers* or as *warehousemen.*

4. His Honor erred in holding that a notice of the arrival of
the goods was necessary to terminate the liability of the company
as a common carrier.

(*a*) As a matter of custom, the proof establishes the fact that
at Union, where there is only this one railroad, no notice was
ever given, except under peculiar circumstances not affecting
this case.

(*b*) As a matter of law the company was not bound to give
any notice.

2 *Redf. on Rail., p.* 63, § 4, says: " And we understand the
cases to have settled the question that the carrier by railway is
neither bound to deliver to the consignee personally, or to give
notice of the arrival of goods."

5. Upon unloading the cars and placing the goods in the
depot, there being no custom or statute law requiring notice of
the arrival to be given, the company immediately became relieved
of its liability as *common carriers,* and only liable as *warehouse-
men.*

1 *Gray* 263.   In this case it is distinctly held that *no notice* of arrival of goods need be given.

The same law as that laid down by the Supreme Court of Massachusetts is held in Indiana, in 12 *Ind.* 55; in New Jersey, in 5 *Dutcher* 394; in Iowa, in 25 *Iowa* 60; in North Carolina, in 6 *Jones* 343; and in Illinois, in the latest case that I can find, 42 *Ill.* 132, it is held " that the rule, though not the best that might be adopted in the premises, is well settled that a railroad company, to discharge its liability as carrier, on getting the goods to their place of destination is not bound to deliver them to the consignee personally, *or give notice* of their arrival; and after storing them in a suitable place to await the demand of the consignee, the liability is only that of a warehouseman."

I am also informed that the same rule obtains in Minnesota.

I think the argument contained in the last two paragraphs of the decision of Chief Justice Shaw, in the above-cited case from 1 *Gray* 263, unanswerable, and as furnishing the law, where the *lex loci* is not contra.

I admit that in other states the rule is different; but in some this notice is required by statute or custom; and in other states railroad charters uniformly require this notice.   In South Carolina, Judge Whitner, in 11 *Rich.* 341, says: " Some future case may settle this question."

6. This, if held to be error in the charge of his Honor the Circuit judge, was one of so material a nature that no authorities are necessary to establish that the defendant is entitled to a new trial.

*Mr. William Munro*, for respondents.

The same point is involved in the seven cases, and is that made in the first ground of appeal, viz.: " Because his Honor charged the jury that unless there is a special exemption in terms of liability brought home to consignee, a common carrier retains its character as a common carrier until notice of the arrival of the goods is given the consignee, and he has a reasonable time afterwards to take the goods."

The liability of the defendant as common carrier continued

until notice to the plaintiffs of the arrival of the goods at Union, and until a reasonable time thereafter for their removal.

The obligation of the carrier is to deliver as well as to carry.

Delivery is either actual or constructive. "Constructive delivery consists of notice, tender, readiness and present ability to deliver according to the contract, all such conditions being reasonable as to time and place, and so constituting duty to receive." 23 *How.* 35.    Mr. Cushing's argument and authorities cited.

Carriers by land must make actual delivery to the consignee at his dwelling or place of business. *Story on Bail.,* § 543; 2 *Kent* 604, 605; 2 *Redf. on Rail.* 60; *Chitty on Carriers* 89, 90.

Carriers by ship deliver at the wharf, but due notice must first be given to the consignee. *Story on Bail.,* § 544, 545; 4 *Bing. N. C.* 314; *S. C.,* 3 *Mann. & G.* 642; 2 *Redf. on Rail.* 65, and authorities hereafter cited.    The rule is stated in the case of *The Eddy,* 5 *Wall.* 495.

The delivery must be on a proper day as regards the weather, and must also be on a business day, and at a proper hour of such day, and the liability of the vessel continues until the owner or consignee has had a reasonable time to examine the goods and determine whether he will take them or not.    23 *How.* 39; *Parsons on Maritime Law, Book I., ch. VII., pp.* 152, 153, 154, and cases cited.

Notice must always be given.    The carrier cannot relieve himself by storing in his or any other warehouse, without giving notice.    49 *N. Y.* 444; 15 *Johns.* 39; 5 *Am. Law Reg. (N. S.)* 692; 45 *N. Y.* 13; 1 *Denio* 45.    Notice to the consignee or a due effort to find him, if he is unknown, is a condition precedent to the right to warehouse the goods.    14 *Wall.* 107; 49 *N. Y.* 444, *supra.*

The rule as to delivery is the same in the case of carriers by sea and inland waters.    52 *N. Y.* 45, 52; 2 *Kent* 605; 5 *Am. Law Reg. (N. S.)* 692, *supra; Angell on Carriers* 310; 3 *N. Y.,* (3 *Comst.*) 322; 49 *N. Y.* 444.

As to what constitutes a sufficient delivery by a railroad company as common carrier, the decisions are conflicting, and the law is not definitely settled.    In 16 *Wall.* 324, Justice Davis, speaking of delivery by railways, says: "Different views have been

entertained by different jurists of what the carrier is required to do when the transit is ended, in order to terminate his liability." Justice Bradley, in a very recent case, (*Grand Trunk Railway* v. *Stevens, Vol. V., No.* 6, *of The Reporter,* 163,) says: "The business of the common carrier, in this country at least, is emphatically a branch of the public service, and the condition upon which that public service shall be performed by private enterprise are not yet entirely settled." In 11 *Rich.* 341, the court says: "Though it may well be claimed that the terms of the contract," (which limited the liability of the company to the unloading of the cars) "dispensed with a personal delivery, some future case may settle the question raised in the argument, whether it also dispensed with notice of arrival."

The Supreme Court of Michigan, in 16 *Mich.* 79, says: "Three distinct views have been taken by different jurists, neither of which can be said to have been, so far, generally accepted as to have become the prevailing rule of the courts." These are—*First.* That the liability terminates when the transportation is ended, and the goods are deposited in the carrier's warehouse, at the place of destination. *Second.* That the liability continues until a reasonable time has elapsed, after the arrival, for the consignee to examine and remove the goods. And, *Third.* That in addition to such reasonable time, notice of arrival must be given to consignee.

The first rule above mentioned was originated by the Supreme Court of Massachusetts in 1 *Gray* 263, and was re-affirmed in 118 *Mass.* 201. It holds that the delivery is complete when the goods are deposited on the platform, if in daytime, and in the depot if at night. It withdraws all protection from the goods at the moment when most exposed to hazard of loss.

The second rule is sustained by a majority of the cases, and probably grew out of dissatisfaction with the first. They generally condemn the Massachusetts rule, and in the greater number, if not all the cases, notice had, in fact, been received by the consignee of the arrival of the goods. And the reasoning which leads to the conclusion reached, would seem to lead to the rule of the common law. See the authorities collected in the argument

for plaintiff in 118 *Mass.* 201; *S. C.,* 19 *Am. Rep.* 436, 437. See, also, 2 *Wait Actions* 50, 51.

But the strength of the argument is with the third rule.   It is thus stated in 44 *N. Y.* 511: "If the consignee is present upon the arrival of the goods, he must take them without unreasonable delay.   If he is not present, but lives at or in the immediate vicinity of the place of delivery, the carrier must notify him of the arrival of the goods, and then he has a reasonable time to take and remove them.   If he is absent, unknown, or cannot be found, then the carrier can place the goods in its freight-house, and, after keeping them a reasonable time, if the consignor does not call for them, its liability as a common carrier ceases." 49 *N. Y.* 225; 49 *N. Y.* 444; 45 *N. Y.* 13; 52 *N. Y.* 637.

It is the rule of the common law.   Carriers were, at common law, held to actual personal delivery.   But carriers by ship were excused from delivery at the consignee's warehouse, *because* the ship could proceed no further than the wharf; notice of arrival and of readiness to deliver were substituted in place of actual delivery to the consignee at his warehouse or dwelling.   44 *N. Y.* 510; 10 *N. Y.* 438; 34 *N. Y.* 501; 49 *N. Y.* 444, *supra;* *Story on Bail.* 545.   In 2 *Redf. on Rail.* 65, it is said: "The course of doing business upon railways, their being confined to a particular route, having stated places of deposit, and generally erecting warehouses for the safe keeping of goods, all seem to require that the same rule as to the delivery of goods should prevail, which does in transportation by ships and steamboats."

Indeed, the similarity in the two modes of carriage is complete. Take the case of a line of sea-going steamers, or say *river* steamers, for the same rule applies to both.   The steamer cannot leave the water, as the cars are confined to the track.   One lands at the wharf, the other at the depot.   There may be, and sometimes are, as many landings for the steamer as stations on the railroad. The time of arrival of the steamer is as reasonably certain as the train.   And the consignee is as likely to know upon which steamer as upon which train his goods may be.   Wherefore should not the same rule be applied to both?   Why should the ship be required to give notice of arrival and the railroad not? Is there any reason why the rule which is applied with rigor in

the one case should be relaxed in the other? Is it because the railroad company deposits its freight in its own warehouse? And without charge? But the ship cannot relieve itself by depositing in its warehouse.

Besides, the depot is not built for the convenience of the shipper or consignee, but for the convenience of the railroad company. 2 *Redf. on Rail.* 56, 57, 58, 59, 67. Depots and warehouses are useful and necessary for the safety and protection of the railroad company as a carrier, but are not absolutely essential to its business or employment as carrier.

For goods lost or destroyed while in the depot awaiting shipment, the railroad company is liable as well as another. Why not also for freight awaiting delivery?

The shipper makes but one contract with the railway, as with the ship. It is to carry and deliver the freight. He makes no contract for storage. Railroad companies are not warehousemen. They store no goods except such as are awaiting shipment or delivery. This is the purpose for which their depots and warehouses are built; to enable them to comply with the strict rule of the law as regards delivery with safety and advantage to themselves. Railways are constantly receiving and discharging freight, and as during those times goods would be liable to be damaged from exposure to all sorts of weather, for which the company would be responsible, depots and warehouses are necessary for the protection of the company. The process of unloading and separating the different consignments, and comparing with the bills, is necessarily tedious, and if carried on without doors would require great additional force, would cause vast accumulations of freight and entail heavy expense, besides multiplying the opportunities for theft. For this reason railways never deliver from the cars; and the consignee, even if present, is required to wait until the goods are placed in the depot and there assorted and compared with the bills, and until the company is ready to deliver.

In Wisconsin, the rule requiring notice to be given was defeated, and the rule limiting the carrier's liability to a reasonable time after deposit in the depot, was established by a divided court, Judges Cooley and Christiancy favoring the former view,

and Campbell and another the latter. The argument on our side is ably put by Judge Cooley in 16 *Mich.* 79.

November 25th, 1878. The opinion of the court was delivered by

WILLARD, C. J.   Each of the above-entitled cases rests in substantially the same state of facts, and involves the same legal questions.   Counsel have presented these cases as if precisely the same proceedings were had and the same rulings given in each, and we must so consider them as it regards the questions raised. There are some minor differences in the facts that do not affect the questions raised by the appeals, and will not be noticed.

The facts are simply that the plaintiffs in the various cases shipped goods by the defendant corporation, as a carrier by rail, that were carried to their place of destination, but before actual delivery were consumed by fire, without fault on the part of the defendants, while in the defendants' depot.   No evidence appears to have been offered tending to show that the place in which the goods were deposited was a safe and substantial warehouse, and no such question appears to have been submitted to the jury.

The court charged the jury " that unless there is special exemption, in terms of liability, brought home to consignees, a common carrier retains its character as a common carrier until notice of the arrival of the goods be given to consignees, and he has a reasonable time afterwards to take the goods ;" also " that the liability of the common carrier, as such, must extend over the whole time of the existence of their lien for freight." To both of these propositions defendants excepted.

The question involved is, when, in the ordinary course of business of a carrier by rail, independent of any special features in the contract, does the liability of the common carrier, as such, cease after the goods have arrived at their place of destination ? The rule as to the termination of the liability of a carrier by rail, as a common carrier, is unsettled in this state, as was recognized in *Wardlaw* v. *Railroad,* 11 *Rich.* 337.   In the other states of this Union much conflict of authority exists.   Such is the divided state of authority that the present decision cannot be largely influenced by any unbalanced weight of authority derived

from the adjudicated cases of the other states.   We may, however, be largely aided in recognizing the principles fundamental to the question, by the able discussion it has received in the courts of various states.

The business of carrying passengers and goods by rail did not directly grow out of that of either the carrier by land or by water, as known to the common law.   If the one had passed into the other by insensible steps, the legal identity of the relations would have been perfect.   In that case it would only be necessary to ascertain whether any modification of the rule applicable to the ancient modes of carriage was rendered necessary by alterations, either in the means employed or the mode of transacting business, the foundation of the liability of the carrier remaining the same in both cases.

The business of a common carrier, as known to the common law, was a mere private undertaking, conducted on a limited scale.   Goods were entrusted to the hands of private persons to be conveyed from place to place.   The common law rule of liability took its present form while the highways of Great Britain were infested by predatory bands, and the carriage of persons and property attended with much hazard.   No one but the carrier and his servants could know to what extent goods undergoing carriage might be unnecessarily exposed to depredation or destruction from the elements, and the law wisely placed the carrier in the attitude of an insurer against all injuries to the property, except such as happened by what was called the act of God and of the public enemies of the realm.   He was compelled to seek out and make personal delivery to the consignee, unless by contract or local custom a substituted delivery was permitted in lieu of actual delivery.

What is just said of the carrier by land is equally applicable to the carrier by water of early times, except that he was excused for damages that happened through the perils of navigation, and he was not bound to seek out the consignee.

It sometimes happened that both the carrier by land and by water could relieve himself of the special liabilities incident to his calling by depositing goods in a warehouse, but that was out of the due course of his contract, which called for personal de-

livery, and only happened when the consignee was either in actual or presumed fault for non-compliance with his part of the contract.

The introduction of railroads not only changed radically the nature of the means employed for carriage, but the character and responsibility of the carrier, the sanction under which his business was conducted, and the methods and habits of dealing between him and those transacting business with him. Public sanction was necessary before the business could be undertaken. Legislation was framed to mould the business to suit the public convenience. The necessity of a large capital to supply the means of conducting the business insures adequate responsibility. The mode in which goods were received, transported and delivered was the subject of rules and regulations publicly known. The consignee, instead of dealing with an obscure person, transacting his business either by himself alone or with the aid of one or more servants who might be in secret accord with him to wrong those entrusting their property to him, dealt with a conspicuous public body, transacting its business by the aid of a large retinue of railroad officials, amply sufficient to protect the property from depredation, and too numerous to unite as conspirators for any predatory purpose. Goods undergoing transportation, instead of being exposed in a wagon, poorly attended, upon a highway, or standing in the public yard of an inn, were received in substantial enclosures, locked up in safe cars, and delivered from depots or warehouses with as much safety as if in the storehouse of the owner.

The history of railroads is part of the public history of the country, and furnishes the means of tracing any relationship that may exist between the ancient and the modern calling. We do not find the wagon-road undergoing gradual change until it was converted into a railroad, nor the wagon gradually transmuted into a train of cars.

Railroad transportation displaced rather than modified the former modes of conveyance, and must be regarded in the highest sense a new method of transportation. In many respects it has been assimilated to the old, for the purpose of defining the legal relations of the carrier by rail. He has been called a com-

mon carrier and subjected to the liabilities incident to that call-ing. This conclusion is universally adopted and cannot be questioned at this late day. But it is still competent to inquire to what extent this assimilation may be carried without running the risk of denoting as identical, things diametrically opposite.

The common law held both the carrier by land and water sub-ject to his primary measure of liability until actual delivery, or where substituted delivery was allowed, until such substituted delivery was perfect. The reason of this was obvious. In the case of the carrier by land the goods were supposed to be exposed to the peculiar risks incident to that mode of conveyance until actual delivery. Neither general nor local custom regarded the carrier as fulfilling the double office of a carrier and warehouse-man. He was not called upon to provide himself with any such means and appliances for guarding the goods committed to his custody. In legal contemplation the goods had no other security than the personal watchfulness of the carrier or his servants. He was not at liberty to divest himself of the duty of making a personal delivery by placing the goods in either a public or private warehouse, such a course not being contemplated by his contract. As a necessary consequence of this view the peculiar risks attending the transportation of goods did not cease when he reached the place of their destination, and accordingly the measure of liability remained unchanged notwithstanding such arrival.

So with the carrier by water. While goods were conveyed by sailing vessels, the duration of a voyage was too uncertain to allow the consignee to estimate with any degree of certainty the time of the arrival of his goods; besides in the imperfect and irregular modes of transmitting intelligence in early times a con-signee in a remote or foreign port might be dependent on notice of the arrival of a shipment for his advices concerning it. Under such circumstances it is obvious that where the contract in its primary import was to make personal delivery, the ship-owner could not discharge himself of its obligations without at least notice to the consignee, if he could with reasonable diligence be found. The reason why notice to the consignee was expected in the case of the carrier by water, was that his contract was to

make actual delivery on board his vessel or on a suitable wharf, lighter or other place according to the usual custom of such port of delivery, while the carrier by land was bound to convey to the consignee's usual place of receiving such goods. The carrier by water to get rid of his liability had to put the consignee in default, so that he might deposit the goods subject to his charge for freight, and to do so, notice was, in the nature of the contract, indispensable.

Thus we find that the mode of terminating the contract in case of the strict carrier by both land and water depended upon the nature of the contract of carriage, and that the law treated the two contracts in a somewhat different manner corresponding to the difference in the means employed and the nature of the business; and we may reasonably conclude that any entirely new mode of conveyance, while still regarded in a general sense as giving rise to the known contract of carriage, would receive the same discriminating consideration at the hands of the law.

These considerations bring us to the conclusion that while a railroad company is to be regarded as a common carrier, yet not in the sense that no modification of the rule of liability of common carriers is to be indulged, but that the same measure of liability exists in both cases where, by parity of reason, like grounds exist for it, and that where the reason of the rule is inapplicable the rule itself cannot be applied. But, even if the railroad company is a common carrier in the strictest sense, still its business would have to be regarded as of a special class, distinct from that either of a carrier by land or water as understood at common law, and therefore entitled to such modifications as it regards the measure of liability as naturally springs from the altered terms of the contract of conveyance, this conclusion being justified by the consideration of the difference allowed between the two species of conveyance formerly comprising the whole ordinary means of transport. These views will find support in the adjudicated cases presently to be considered. It is generally conceded by the authorities that a railroad company as a carrier of freight is not bound to make delivery to the consignee at any other place than its own depot. The prevailing idea is that the company only agrees to convey to a place of

destination and hold safely there for the use of the consignee or owner.    In other words, the railroad company is regarded not as contracting to convey generally, but by the special means of conveyance with which it conducts its business.    As its carriages are made to run only on a road of particular construction they are regarded as strictly confined to such road, and therefore the points at which the company contract to take and deliver goods are regarded as identical with the terminal points of the road on which their carriages run, or with points intermediate such termini.

In the respect just mentioned, the contract of the carrier by rail differs materially from that of the ordinary common carrier by land, and as has been noticed in the cases, approximates more nearly that of the carrier by water.

Notwithstanding this fact, the liabilities imposed by the authorities, if those of the State of New York are excepted, are those that belong to the common carrier by land.

While, as has been said, it has become well settled that the measure of liability is the same under both contracts, yet it is clear that the time when that peculiar liability ceases, as it regards the carrier by rail cannot be fixed by reference only to the rule in the case of the ordinary common carrier, for the difference between the contracts is material as it regards the mode of terminating the risks by delivery.

It certainly would not be proper to say that the contract of the carrier by rail shall be referred to that of the ordinary carrier by land, for the purpose of determining the measure of primary liability, but to that of the carrier by water to ascertain when that primary measure of liability ceases.    This would be dealing with the subject on merely arbitrary grounds and not rationally.    There is another reason why we cannot look to the contract of the carrier by water as affording the tests for saying when the liability of a common carrier ceases in the case of carriage by rail.    The carrier by water, although not bound to take goods beyond the customary landing-place, in search of the consignee or owner, is bound to give notice of the place of intended delivery, yet, according to the clear weight of nearly all the authorities, the railroad company is not bound to give such notice.    It is proper

here to notice what will be more fully considered hereafter, that there are *dicta* in the judicial decisions of New York to the contrary of the proposition just stated, but the judicial authority of a single state is not sufficient to outweigh general consent in a matter depending on general considerations and not on local statute law. The reason of the distinction referred to is obvious. No particular place of delivery is usually fixed by the contract for carriage by water; but any customary point of delivery at the port or place of destination, is within the contemplation of the contract, so that while the consignee may know that at a certain port or harbor his goods will be found at the end of the voyage, yet at what particular place in such port or harbor cannot be ascertained from the terms of the contract of carriage. The port of delivery may be a large seaport town, where it would be practically impossible to keep himself informed, without notice, of the arrival of vessels or goods at all the points of delivery possible under the contract. On the other hand, the contract of the carrier by rail contemplates a certain known place as the point of delivery, namely, the depot of the road at the point of destination. In following the clear weight of authority and reason to the conclusion that the railroad company is not bound to give notice to consignees of freight, we depart materially from the terms and intentions of the contract of the carrier by water, and cannot rest upon it as a test of the present question.

We must, therefore, come back for such help as we can get from the principles and analogies that are suggested by the contract of the ordinary common carrier by land.

The primary liability of the ordinary common carrier is only continued by the law of his contract so long as the goods are subject to the risks incident to that mode of carriage. This follows from what has been already said. To use a simple illustration, not far from the fact in early days, when the law was taking its final shape, the goods did not leave the carrier's wagon until they were put in the consignee's hands. In other words, the goods are assumed to be subject to the risks attending transportation until actual delivery, or what might be substituted for it. The primary liability lasted, therefore, no longer than the period

during which the property was subject to the risks of transportation.

Allowing the full force of this principle to the case of carriage by rail, and there still remains a question whether goods in the hands of a carrier by rail are to be regarded as subject to the risks of transportation at all times while they are in the hands of the carrier, even after their arrival at their place of destination and though placed in a safe and proper warehouse belonging to the carrier for the benefit of the consignee, and until the consignee takes them away or is in default for not complying with his part of the contract by paying freight and taking them away.

This is the exact question that has been discussed and variously decided in the courts of different states. Although the present case does not bring to view all the possible elements of this question, inasmuch as it is not made to appear that the goods of the plaintiffs on arrival were placed in a safe and proper warehouse, yet it is essential that the question should be discussed upon all its features, although a less extended consideration might suffice to dispose of the case as it stands.

That railroad companies who conduct their business in the most approved manner, have at command warehouses properly constructed and guarded for the safe custody of the goods of consignees appears to be conceded in all the cases as a matter of public notoriety. Assuming such to be the fact in a supposed case, and that at the arrival of goods the consignee not being in waiting to receive them, they are placed in such a well-constructed and guarded warehouse under the care of proper persons ready at all reasonable times to deliver such goods to the owner or consignee on demand and compliance with the contract of affreightment, could such goods be properly said to be subject to the peculiar risks of transportation while so placed? To make such an affirmation would only be possible through a confusion of terms. If, on the other hand, the goods have actually passed beyond the reach of the proper risks of transportation, what warrant is there from any principle or analogy furnished by the law of the ordinary carrier's contract, for insisting that the carrier shall remain bound as an insurer against a certain class of risks after such risks have ceased to exist? Clearly there is

none.   If we are at liberty to follow the reason of the case, it is clear that we must come to the conclusion that the liability of a carrier by rail, considered as an ordinary common carrier, ceases the moment the goods have arrived at their place of destination, and are placed in a properly constructed and guarded warehouse subject to the demand of the consignee.   The mere unloading of goods upon an open platform, accessible to persons who have no right to handle the goods, is clearly not contemplated by the proposition just stated, nor ought it so to be, for goods so placed are in every sense subject to the risk of transportation, and even more exposed than when locked up in cars either in motion or at rest.

It remains for us to consider how far a clear weight of authority must be allowed to influence our final conclusion.   A question much discussed in the cases, as to whether the liability of a common carrier does not remain even after the goods have been securely placed in a proper warehouse at the point of destination until after the expiration of a reasonable time for the consignee to call and take them away, will be discussed in connection with the adjudicated cases.

*Norway Plains Co.* v. *Railroad,* 1 *Gray (Mass.)* 263.   This is a leading case in Massachusetts and has been recognized as such by the courts of several of the states.   It fully sustains the proposition that placing the goods at the place of destination, in a proper warehouse for the use of the consignee, without additional charge, provided he shall demand them in a reasonable time, is a complete performance by the carrier by rail of his duty as a common carrier, and his subsequent liabilities are those of a warehouseman.   It indicates the proper effect of the delay of the consignee to take away his goods in a reasonable time, namely to authorize the carrier to charge as warehouseman for the subsequent custody of the goods, while, until the lapse of such reasonable delay, the sums agreed to be paid for transportation include the proper charges for storage.   The carrier is, by this case, treated as a warehouseman from the moment that the goods are lodged in his warehouse.

This case illustrates the principle, that where the peculiar risks to which goods are exposed in the course of transportation cease,

the special compensations for such risks ought to cease also. *Rice* v. *Hart*, 118 *Mass.* 201.* This case follows the last-mentioned, but unless carefully read might create the impression that that case went to the extent of holding that the mere unloading of the goods upon the platform of a depot at the place of destination of itself terminated the liability of the carrier, but a careful comparison of the cases shows that the Norway Plains Co. case treated the platform in that case as within and part of a suitable warehouse. The probable explanation of the peculiar language of *Rice* v. *Hart* is, that it intended an inquiry, whether conceding the platform in question to be part of a suitable warehouse, there was a termination of the contract of the carrier, as such until after the goods had been removed from such platform into a place fitted for more permanent storage.

In this point of view the Norway Plains case certainly holds that the platform, being part of the warehouse, deposit upon it was sufficient in itself. This is perfectly consistent with the general rule that goods delivered to a warehouseman, at the usual place for receiving goods, are regarded as stored, prior to their removal to a position for permanent storage. The rule established by the cases appears to be finally settled in the State of Massachusetts.

*Railroad* v. *Ayres*, 29 *N. J.* 393. This case does not involve the direct question under consideration, but merely the reasonableness of a by-law of a railroad company relating to the mode of discharging freight. Haines, J., however, undertakes to state the rule of duty by which the carrier by rail is affected. He says " the obligation of a common carrier by railway is, safely to transport the goods to the place of destination, to deposit them without delay, and without additional charge, in their warehouse, until the owner or consignee has a reasonable time to remove them. They are not required, as carriers by wagons, to deliver at the door or place of business of the owner or consignee, nor as carriers by water, to give notice of their arrival."

This is certainly a clear interpretation of the contract, but the statement of the consequences flowing from it is not equally fortunate. He says again : " Having the merchandise in good order

*S. C., 19 *Am. Rep.* 436.

and safety, stored and protected from weather and from tres-
passes and ready for delivery, allowing a reasonable time for the
owner or consignee to remove them, their duty as carriers ceases;
and they were no longer liable as carriers." The case did not
call for the statement of the consequences to flow from the car-
rier's contract; had it done so, doubtless some explanation would
have been offered for the continuance of the carrier's liability as
such, after the goods had been placed beyond the reach of the
peculiar risks attending transportation, by being safely lodged in
a warehouse at the place of destination. Accepting the interpre-
tation here put upon the contract, that the carrier by rail is bound
to put the goods at the place of destination in a suitable ware-
house, what, we would ask, was the intent of such a stipulation,
whether actually made or to be presumed? Clearly none other
than that the goods, at their arrival at the place of destination,
should forthwith be put in a state of security, freeing them from
subjection to the risks of transportation. If the carrier complies
with such obligation and places the goods beyond exposure to
such hazards, there is no propriety in still holding him to the
same responsibility as if the goods were yet exposed to those
risks. Such a construction would be equitable, the carrier would
gain nothing by providing a warehouse for the security of the
goods, while 'the consignee would be under a motive to leave the
goods stored at the cost of the carrier, protected by the double
security of a proper warehouse and a carrier's liability as insurer
up to the last moment that the law would adjudge reasonable.

Public convenience is often referred to as influencing the view
to be taken of the contract of the carrier by rail, but if that con-
sideration has any weight here, it would be on the side of fur-
nishing railroad companies with an adequate motive for providing
all their depots with safe warehouses, which might be afforded,
could they know that 'their special liability as common carriers
might be terminated by the proper use of such appliances.

*Moses* v. *Railroad,* 32 *N. H.* 523. The discussion of the
general question of the mode by which a carrier by rail may
discharge himself of liability as a common carrier, might well
have been avoided in this case, for the jury had found actual
negligence on the part of the railroad, and as the verdict in other

respects did not present all the elements necessary for a full dis-cussion of the question, Sawyer, J., enters at length into the discussion.    While seeming to assent to the proposition that the carrier by rail ought to provide suitable warehouses for the pro-tection of goods awaiting removal, yet he holds that the full measure of liability as common carrier remains until a reasonable time for removing the goods has elapsed.    The reason assigned for this is that the goods, though in a warehouse, were still subject to the exclusive control of the carrier and his servants. Doubtless this is true, but the nature of the risk remaining must be looked to, and this is the same and no other than all goods are subjected to that are undergoing storage in the hands of a bailee.    The law properly estimates that class of risks when it places the liability of the warehouseman, on the ground of failure of due care.    The risks attending transportation belong, in the estimation of the law, to an entirely different class, and call for a measure of liability that is exceptional, as compared with the responsibilities incident to all other forms of bailment.    No good reason is presented in the case or perceived why this exceptional liability should remain after the risks have been reduced from an exceptional character to the ordinary risks incident to a bail-ment for the purposes of storage. . There is no propriety or authority for holding railroad companies to providing storehouses in addition to what is imposed on ordinary carriers, unless such is the contract of carriage; and if such is the contract of carriage, it is senseless unless compliance with the obligation to place in warehouses involves a release from that liability which would ensue if such obligation was not complied with.    It would be equivalent to saying we will hold you as insurers of the goods unless you place them beyond the reach of the risks of transpor-tation, but nevertheless, though you so place them, we will still continue to regard you as insurers.    Judge Sawyer regards the claim of exemption from the liabilities of a common carrier by showing that the goods were placed in a warehouse, as a case of attempting to throw off the liabilities of the contract of convey-ance without the fault of the consignee.    How this can be recon-ciled with the concession that it is part of the duty of the carrier by rail to " protect the goods from weather and depredation," is

not apparent. It is probable that he had in mind the case of a carrier by water, who is not at liberty, by the terms of his contract, to place the goods of a consignor in a warehouse without attempting a direct delivery, but as he fully recognized the difference that exists between the contract to convey by water and that by rail in this respect, it might be supposed that he would have traced such distinction in the consequences flowing from the two contracts. The explanation given in the opinion for this conclusion is, that placing the goods in a warehouse, solely protected by warehouse responsibilities, is an act not called for by the contract of conveyance. But he had previously said that it was the duty of the carrier to protect the goods " from weather and depredation " while in the process of unloading and awaiting removal. This language certainly would not be applied to the carrier by wagon, considered as an insurer of safe delivery in good order, and its only force lies in the fact that railroad companies usually offered warehouse facilities for such purposes. If the learned judge in the language noted means merely that such discharge of the liabilities of the common carrier is no part of the contract, then the contract is left without that reciprocity of obligation that is demanded by the rules of sound interpretation. In other words, the contract is one-sided—increasing the duties of the carrier without any corresponding consideration for such accession of responsibility. The case just considered cannot be regarded as finally adjudicating the various matters discussed in the opinion of the court, as they were not necessarily involved.

*Blumenthal* v. *Brainard*, 38 *Vt.* 402. This case seems to have involved, principally, the question whether the defendant had modified his liability as a common carrier by notice relating to the mode of discharging goods. But the discussion of the question was carried beyond that view of the case. The contract of carriage was treated in this case, precisely as if it had been a contract to convey by water, with the single exception that it was conceded as the result of the authorities that no notice of arrival was necessary. The doctrine of the case is, in general terms, that the carrier by rail remains liable as a common carrier until the consignee has had a reasonable time to remove the goods. It admits of doubt, whether the court had in mind the

case of goods placed on arrival in a suitable warehouse, but assuming that such was the intended meaning of the case, it certainly affords a striking illustration of the objection to continuing the strict liability of a common carrier after the goods are placed in safety. The necessity of determining what is a reasonable time within which the consignee should call for his goods, according to this case, renders necessary the introduction of a jury; that the law furnishes no other solution than that which can be afforded by the verdict of a jury. If the parties can come to an understanding as to what time shall be deemed reasonable, it must be by compromise, for no 'legal rule or principle, capable of being applied without a jury, can solve the problem according to this authority. It is certainly unfortunate, if no better mode can be found for adjusting the differences that must frequently arise, even without the fault of the parties concerned in the course of an immense commerce of this class, especially when arising, as it often does, out of a purely accidental event, such as the accidental burning of a building, a hardship equally to both parties. To require parties under such circumstances to add to their misfortunes a law suit, is certainly to be avoided if possible. It is true, that even under the view that a railroad company may discharge itself of the liabilities of a common carrier by storing the goods, yet if such storage is neglected, the question of what is a reasonable time within which the consignee should have called for his goods may arise, and have to be disposed of by means of a jury, but in that case the burden of the suit would be occasioned by the neglect of the railroad company to avail themselves of the means of discharging that liability. In that case the railroad company could only justly blame themselves, and not the law for not providing them with the means of avoiding litigation. But the hardship is apparent when the railroad company having faithfully done all demanded by them for the security of the consignees' goods, still incurring this misfortune of an accidental destruction of its buildings by fire, are yet compelled to undergo the burden of ascertaining by a burdensome appeal to a jury whether there had been no delay in removing his goods by the consignee.

Still such considerations are not in themselves conclusive. We

must follow the contract and not abstract considerations of justice. If the contract bears the construction that appears reasonable, then this evil is avoided. And the question whether it is reasonable, looks to some extent to the character and mode of adjusting the ultimate rights growing out of it. If parties have in view a direct and simple way by which they may disentangle and adjust their relations, and another that leads to entanglement and needless litigation, all other things being equal it must be assumed that they intended the better and rejected the worse.

If resort to the verdict of a jury in such cases is a hardship, it is all the more so when the mode of determining the reasonableness of the delay is unequal and arbitrary, as it is made by the language of the case under consideration. Kellog, J., holds that a reasonable time is such " as would give a person residing in the vicinity of the place of delivery, and informed of the usual course of business on the part of the servants of the company in unloading the cars and delivering the goods of that character, and also informed of the time when the goods may be expected to arrive, suitable opportunity within the usual business hours for delivering such goods after they had been placed in readiness for such delivery, to come to the place of delivery and inspect the goods and take them away." After all, as full as the statement of this rule is, it is virtually a negation of the rule that the consignee is entitled to reasonable time to call for his goods, except where the consignee is a resident immediately at the termini and intermediate stations of the railroad. All other consignees must be satisfied with the measure that fits those who reside in the immediate vicinity of a railroad station, although it may not afford a reasonable time considering their circumstances. In its application to land conveyance this statement of the rule must be regarded as purely arbitrary, having no antecedent in general or local custom. Perhaps it is the best that could be done to avoid the intrinsic difficulties of the position assumed, but that admission would be fatal to the construction of the contract of conveyance that calls for judicial interposition of such a character. Such a rule may be necessary in the case of vessels trading from port to port, having goods consigned to a port at which it can only make a temporary stay, and under the necessity

of discharging such freight either by immediate delivery to a consignee, or of depositing for his account in a public warehouse, but even in that case its form must come from general usage, but has no applicability to a railroad having a storehouse for freight at every point at which it can be called on to make delivery.    It is the irresistible conclusion from the case just considered, that the view of the contract of the carrier by rail that holds him responsible as a common carrier after he has deposited goods at the place of destination in a suitable warehouse, is attended by difficulties theoretical and practical so numerous as to enforce the conviction that it is a departure from the beaten paths of the law.

*Bausemen* v. *Railroad*, 28 *Ind.* 434.    This case fully sustains the proposition that the liability of the railroad company as common carrier ceases when the goods are placed in a warehouse at the point of destination, without notice to consignee.

*Francis* v. *Railroad*, 25 *Iowa* 60, sustains the same proposition as that last stated.    *Wood* v. *Crocker*, 18 *Wis.* 345, follows *Moses* v. *Railroad*, already commented on, but adds nothing to the strength of the reasoning of that case.

*Railroad* v. *Scott*, 42 *Ill.* 132.    The rule, as applied by this case, is thus stated by Breeze, J.: "But the rule is settled that no notice is necessary to the consignee, and if he is not present to receive the goods, which he has no means, by the use of ordinary diligence, of knowing have arrived, the carrier can store the goods safely in a suitable warehouse and await the demand of the consignee.    When thus stored, the duty of the railroad as a common carrier terminates and that of a warehouseman begins; the warehouse must be a safe and secure place."

This same proposition is again stated in *Vincent* v. *Railroad*, 49 *Ill.* 247, although not directly involved in that case.

*McCarty* v. *Railroad*, 30 *Penn.* 247.    While this case can hardly be regarded as finally settling the rule for Pennsylvania, as it involved circumstances of a special character, yet the language of the case is explicit, and sustains the views presented above.

The New York cases do not appear to have received that clear

investigation that have usually characterized the treatment of commercial cases in the courts of that state.

*McDonald* v. *Railroad*, 34 *N. Y.* 497. This case related wholly to the duty of an intermediate carrier, as it regards transmission to the next carrier in line. The decision is not necessarily inconsistent with the doctrine that the carrier, at the point of destination, may discharge himself of liability by deposit in a warehouse; but in the course of the remarks made by Smith, J., a different view was presented. He holds that, according to the weight of authority in that state, as applicable to both carriers by rail and water, notice to the owner or consignee of the arrival of the goods, and a reasonable time and opportunity after notice to remove them, would come in lieu of personal delivery. On examining the antecedent cases in that state, no such authority has been found as applicable to railroad carriage, although the rule, as applied to water carriage, has abundant support. *Fisk* v. *Newton*, 1 *Denio* 45; *Ostrander* v. *Brown*, 15 *Johns.* 39; *Miller* v. *Nav. Co.*, 10 *N. Y.* 431. It is to be inferred that the learned judge assumed that the two cases were without distinction as it regarded the applicability of the rule, and that his reference has relation to the cases bearing on the liabilities of carriers by water. This case can, in no proper sense, be regarded as deciding the proposition thus commented upon.

*Witbeck* v. *Holland*, 45 *N. Y.* 13. Again, in this case a statement of the general rule as affecting carriers by rail was attempted, although the case was against an express company, and therefore involved a more strict application of the rule as affecting ordinary common carriers than is appropriate in the case of carriers by rail. Groom, J., incidentally remarks, in regard to carriers by boat and railway, that "such carriers discharge themselves from responsibility as such. by transporting the goods to their nearest business station to the residence or place of business of the consignee, and notifying the consignee of their readiness to deliver the goods at such station." The object of making this statement is clearly disclosed as merely negative, by his adding that express companies were not entitled to this exemption. This case must be excluded from the list of those entitled to authority in the settlement of the present question.

*Fenner* v. *Railroad,* 34 N. Y. 505.   In this case the consignee was present when the goods arrived, and, at his request, the goods were placed in the defendant's warehouse and there consumed by accidental fire.   It was clearly a case for the discharge of the defendant from liability as common carrier under either view that might be taken of the general rule, for it was the case of an independent bailment disconnected from the duty of the defendant as common carrier.   The court might well have avoided discussion of the general rule, nevertheless, Earle, commissioner, states that the rule adopted in Massachusetts had not been adopted in New York.   He holds the contrary of that doctrine, alleging, as the ground of that conclusion, certain considerations of public convenience.   He says : " From the drift of the decisions in this state, I think we may fairly infer the following rules as to the delivery of goods at their place of destination by a railroad carrier.   If the consignee is present upon the arrival of the goods, he must take them without unnecessary delay.   If he is not present, but lives at or in the immediate vicinity of the place of delivery, the carrier must notify him of the arrival of the goods, and then he has a reasonable time to take and remove them.   If he is absent, unknown or cannot be found, then the carrier can place the goods in its freight-house, and, after keeping them a reasonable time, if the consignee does not call for them, its liability as a common carrier ceases.   If, after the arrival of the goods, the consignee has a reasonable opportunity to remove them and does not, he cannot hold the carrier as an insurer.   The carrier's liability thus applied and limited, I believe, will be found consonant with the public policy and sufficiently convenient and practicable."   Considered as a statement of the state of the law in New York, this is deficient.   In the first place, because not essential to the decision of the case; and, secondly, because it professes to be matter of opinion alone.   Its conclusion is not stated as constructed from the solid wood of adjudicated cases, but from the " drift " of the decisions.   As a judicial inference, which, in terms, it professes to be, it lacks fundamental character, for, instead of reasoning from the terms and equity of the contract itself, it summons to its support only considerations derived from what is conceded to be public con-

venience.    When carefully considered, we think public conve-
nience will be best promoted by the opposite rule, but, at all
events, too great stress should not be laid on that consideration,
as it is peculiarly the province of the legislature to conform the
transactions between private individuals to such forms and modes
as may be essential to promote public convenience.

*Hedges* v. *Railroad,* 49 *N. Y.* 223.    This case depended upon
special circumstances that rendered a statement of the general
rule unnecessary.    The question actually considered was whether
the consignee had used due diligence in removing his goods be-
fore the burning of the defendants' depot by fire.    The appeal
appears to have been based on a charge that the question of neg-
ligence was for the jury.    On appeal it was held that this was
erroneous ; on an admitted state of facts it was for the court to
say whether there was or was not negligence.    This conclusion
is in conflict with *Blumenthal* v. *Brainard, supra,* and assumes
that the law supplies a fixed standard of what is to be considered
negligence in such a case—a proposition that needs better sup-
port, as it regards carriage by rail, than any that has been found
in the adjudicated cases.    In this case Folzer, J., states the general
rule on the authority of *Fenner* v. *Railroad* alone, the author-
ity of which case has just been considered.

It is singular that this question does not appear to have re-
ceived in the courts of that state the consideration that its
importance demanded.    This is to be regretted, for the decisions
of the courts of New York, especially on commercial questions,
are consulted with great interest wherever its able judiciary
bestow full consideration upon them.    It is also singular that
the view of the New York judges should run counter to the
general current of the authorities elsewhere on the subject of the
duty of the carrier by rail to give notice.

On the whole, the weight of best authority appears to be with
the conclusion already stated as naturally flowing from the con-
tract of the carrier by rail.    Certainly the reasons that induce
that conclusion have not been shaken by the positions assumed
in the various cases by those holding opposite views.

The Circuit judge was clearly in error in holding the defend-
ants liable, as common carriers, until notice was given and a

reasonable time elapsed for removing the goods. Notice was not necessary, and the question whether the liability as a common carrier remained after the arrival of the goods, and until the consignee had a reasonable time to remove them, depended on whether the goods remained exposed to the risks of transportation or were safely stored in a suitable warehouse.

The judge also erred in holding that the liability of common carrier subsisted as long as the lien of the carrier subsisted for freight. Had the goods, on default of the consignee to claim them in due time, been deposited in a public warehouse, the liability of the carrier would have ceased without destroying the lien for freight, and this is sufficient to render the statement of the proposition erroneous without regard to the effect of other modes of terminating the carrier's responsibility. There must be a new trial.

McIVER, A. J. I concur fully in the result of the opinion, filed by the Chief Justice, in these cases. I think he has conclusively demonstrated that there was error in the charge of the Circuit judge in both points embraced by the exceptions. But I am not prepared to assent to the proposition contained in the opinion, " that the liability of a carrier by rail, considered as an ordinary common carrier, ceases the moment the goods have arrived at their place of destination, and are placed in a properly constructed and guarded warehouse subject to the demand of the consignee." And on the contrary, as at present advised, I am inclined to the opinion that while the carrier by rail is not bound to give notice to the consignee of the arrival of his goods, yet that his liability as carrier continues until the consignee has had a reasonable time after the arrival of the goods to remove them. The error, therefore, of the Circuit judge, according to my view, consisted in fixing the period when such reasonable time would begin to run, at the time when notice was given instead of at the time of the arrival of the goods. The rule as to a carrier's liability has been too long and too well settled to admit now of any dispute, even though we might, upon abstract principles, be disposed to regard it as a harsh and unjust rule. That rule is based largely upon considerations of public policy. As Best,

C. J., says in *Riley* v. *Horne,* 5 *Bing.* 217 : "Where goods are delivered to a carrier they are, usually, no longer under the eye of the owner ; he seldom follows or sends any servant with them to the place of their destination.  If they should be lost or injured by the grossest negligence of the carrier or his servants, or stolen by them, or by thieves in collusion with them, the owner would be unable to prove either of these causes of loss.  His witnesses must be the carrier's servants, and they, knowing that they could not be contradicted, would excuse their master and themselves.  To give due security to property, the law has added to that responsibility of a carrier which immediately arises out of his contract to carry for a reward, namely, that of taking all reasonable care of it, the responsibility of an insurer." This language implies that the reason of the rigid rule as to the liability of carriers rests, mainly, upon the fact that the evidence of the cause of the loss or injury to goods, while in the hands of the carrier, must be sought for from those who are supposed to be under the influence or control of the carrier.

Now while it is very true, as abundantly shown in the opinion of the Chief Justice, that the introduction of this new mode of carriage, by rail, differing so essentially, in many respects, from any mode of carrying known at the time the rule was established, demands some modifications of the rules regulating the contract for carriage by land, yet the same reason as that above indicated, applies with equal, if not greater, force to a carrier by rail as to a carrier by wagon or other primitive mode of transportation.

The rule was established not merely, as seems to be assumed, for the purpose of protecting the shipper while his goods were in the course of transportation, or as it is expressed, while exposed to the risks of transportation, but also while they were in the possession and under the control of the carrier for the purpose of being transported and until they were delivered.  It is obvious that if the goods of the shipper are destroyed after being placed in the depot of a railroad company, it would be quite as necessary for him to resort to the servants and employees of the company for evidence showing the cause of the loss, as if they were destroyed in the cars before they were taken out and placed

in the depot.  It will not do to say that the carrier's liability, as such, exists only while the goods are exposed to the risks of transportation, which must mean only while the goods are in the course of transportation, for goods in a depot, awaiting shipment, are certainly not in the hands of the railroad company as a warehouseman, but as a carrier.  Suppose cotton is hauled to the depot of a railroad, and deposited either on the platform or placed in the depot in the evening to be shipped the next day, and the railroad agent gives a receipt to the shipper for the cotton : if, during the night, it is destroyed by an accidental fire, would not the company be liable?  If so, why?  Because the carrier has received the cotton under a contract to carry it to a certain point, and although it is destroyed before the transportation commenced, and therefore before it was exposed to any of the risks of transportation, having so received it the liability of carrier immediately arose.  This is adverted to merely for the purpose of showing what is conceived to the defect in the argument in support of the view taken by the Chief Justice, viz., that the carrier is only liable, as such, while the goods are exposed to the risks of transportation.  It is said, however, that the obligation of a railroad company to provide safe and suitable warehouses or depots is one-sided and without any corresponding advantage, unless it is allowed to use these depots for the purpose of relieving itself from liability as a carrier.  To this it may well be answered that these depots are erected for the convenience and security of the company, and are required by the exigencies of its business demanding that its vehicles of transportation should make only short stops at the various stations, which forbid delivery directly from such vehicles to the consignee ; and that, as it is exempted from the obligation of making actual delivery of the goods entrusted to it, at the place of business of the consignee, as in the case of carriers by wagon, and from the obligation of giving notice, as in the case of carriers by water, such exemptions afford it ample compensation for the additional obligation imposed upon it.  It seems to me that there is an obvious inconsistency in the proposition laid down in the case of *Norway Plains Co.* v. *Boston and Maine R. R. Co.*, 1 *Gray* 263, which may be regarded as the leading case in support

of the view presented by the Chief Justice. In that case the proposition is laid down, that placing the goods, at the place of destination, in a proper warehouse for the use of the consignee, without additional charge, provided he shall demand them in a reasonable time, is a complete performance by the carrier by rail of his duty as a common carrier, and his subsequent liabilities are those of a warehouseman. This proposition involves the idea that the freight money is a sufficient compensation not only for the actual transportation of the goods, but for the subsequent care of them between the time of their deposit in the warehouse and the expiration of a reasonable time thereafter, within which the consignee may take them away without paying anything for storage during that time. It follows, therefore, that during such reasonable time within which the consignee is allowed to remove them, that the railroad company could not charge for storage as a warehouseman. If this be so, how can it be said that during that time the railroad company holds the goods as warehouseman? If it did, then clearly it ought to have the right, which is denied by the terms of the proposition under review, of charging for storage as a warehouseman.

The theory upon which the case rests, as is said in the subsequent case of *Rice* v. *Hart,* 118 *Mass.* 201; 19 *Am. Rep.* 433, is " that delivery *from* themselves [the railroad company] as common carriers *to* themselves, as keepers for hire, discharges their responsibility as common carriers." If so, then the company must be considered as though it were two separate and distinct persons—a carrier and a warehouseman—and by what authority one can be regarded as under an obligation to perform the duties incident to his calling as a warehouseman, among which is that of securely keeping the goods entrusted to his care, for a single day or a single hour, without any compensation whatever, simply because he may have received compensation for performing duties incident to another and altogether different calling, I am unable to understand. If, at the moment that the goods are delivered by the railroad company, as a common carrier to itself as a warehouseman, its liabilities as a carrier cease, and its liabilities as a warehouseman begin, it would seem necessarily to follow that at the moment when its liabilities as a warehouseman begin, its

rights, as such, among which is the right to charge for storage, would also begin; for it would be a strange anomaly to.subject one to the *liabilities* incident to a calling or position without, at the same time, conferring upon him the *rights* incident to such calling or position. And yet both of these Massachusetts cases necessarily involve this result. During the period between the deposit of the goods in the warehouse and the expiration of the reasonable time within which the consignee is permitted to remove them without charge, the goods are in the possession of the company, in the one capacity or the other, either as carrier or warehouseman. If the former, then the *liability* is that of a common carrier. If the latter, then the right is that of a warehouseman, to charge for storage. The only possible way of avoiding this inconsistency would be to push the doctrine to its legitimate result, by holding that the consignee must not only pay the freight for the transportation of his goods, but also storage from the moment they are placed in the depot until he is able to take them away. To this result, so glaringly unjust, the courts of Massachusetts do not seem willing to go, and hence the inconsistency which has been pointed out. If it is conceded that this question has never been decided in this state, and that the decisions elsewhere are conflicting, I do not propose, now, to enter upon a review or analysis of the cases, my only object being to indicate some of the reasons why I am unable to assent to the proposition above stated.

HASKELL, A. J. I cannot concur that there was error in the first proposition charged, but believing that there was error in the second, I concur in the result.

New trial granted.